## CHARLES W. GODDARD vs. THE GRAND TRUNK RAILWAY OF CANADA.

A common carrier of passengers is responsible for the wilful misconduct of his servant toward a passenger.

A passenger who is assaulted and grossly insulted in a railway car by a brakeman employed on the train, has a remedy therefor against the company.

If a brakeman, employed on a railway passenger train, assault and grossly insult a passenger thereon, and the company retain the offending servant in their service after his misconduct is known to them, they will be liable to exemplary damages.

The plaintiff, a highly respectable citizen, and a passenger in the defendants' railway car, on request, surrendered his ticket to a brakeman authorized to demand and receive it. Shortly after, the brakeman, without provocation, approached the plaintiff in his seat, and, accosting him in a loud voice, denied, in the presence of the other passengers, that he had seen or received the plaintiff's ticket, and, in language coarse, profane, and grossly insulting, called the plaintiff a liar, charged him with then attempting to evade the payment of his fare and with having done so before; and leaning over the plaintiff, then in feeble health and partially reclining in his seat, and bringing his fist down close to his face, violently shook it there and threatened to split the plaintiff's head open and to spill his brains right there on the spot, with much more to the same effect. The defendants, although well knowing the brakeman's misconduct, did not discharge him, but retained him in his place, which he continued to occupy at the time of the trial. The jury was instructed that the case was a proper one for exemplary damages, and they returned a verdict for $4,850, which the court declined to set aside.

On EXCEPTIONS and motion to set aside the verdict as being excessive.

TRESPASS for an alleged assault by a servant of the defendants, in one of their first-class passenger cars, upon the plaintiff, a respectable and well-known member of the legal profession, having been county attorney, several times State senator, president of the senate, and representative of the country abroad, and being, at the time of the trial, judge of the superior court for the county of Cumberland.

Upon the question of the defendants' liability, the presiding judge instructed the jury *inter alia*,—

That if, when Jackson approached the plaintiff, he believed the latter was fraudulently attempting to evade the payment of his fare, and his purpose was to ascertain whether or not his belief was well founded, he was acting within the scope of his authority; and if, in the discharge of that duty, he assaulted the plaintiff in the manner testified to by him, the defendants were responsible for the assault.

On the subject of damages, the presiding judge instructed the jury,—

That, in the first place, if the plaintiff was entitled to recover any damages, he was entitled to such damages as he had actually suffered; and, in estimating the amount, they would not be limited to what he had lost in dollars and cents; that they might properly consider the injury to his feelings, his wounded pride, his wounded self-respect, his mental pain and suffering occasioned by the assault, and the feeling of degradation that necessarily resulted from it; that a man's feelings, self-respect, and pride of character are as much under the protection of the law in such case as his property; that, in estimating the damages for a personal assault attended with opprobrious and insulting language, the jury have a right to consider the character and standing of the person assaulted, and the injury to his feelings, as well as the injury to his person, and then to give him such damages as, in view of all the circumstances, would be a just compensation for the injury actually suffered; that, if the injury was wanton, malicious, committed in reckless and willful disregard of the rights of the injured party, the law allows the jury to give what is called punitive or exemplary damages; that the law blends the interests of the injured party with those of the public, and permits the jury not only to give damages sufficient to compensate the plaintiff, but also to punish the defendant; that they should be very cautious in the application of this rule; that the law does not require them to give exemplary damages in any case; that when the damages which the plaintiff is entitled to recover, in order to compensate him for the injury he has actually

suffered, are sufficient to punish the defendant and serve as a warning and example to others, the jury ought not to give more; if they think such damages are not enough, then the law allows them to add such further sum as will make it sufficient for that purpose; but they should be careful, in fixing the amount, not to allow more than is just and reasonable, and not to allow their judgments to be swerved by passion.

The defendants requested the presiding judge to instruct the jury, that, if they found that the acts and words of Jackson were not directly nor impliedly authorized nor ratified by the defendants, then the plaintiff was not in any event entitled to recover vindictive or exemplary damages against the defendants, nor damages in the nature of smart-money. But the presiding judge, having already instructed the jury ·upon what state of facts the plaintiff would be entitled to such damages, declined to comply with the request.

The jury returned a verdict for the plaintiff for $4,850. And the defendants alleged exceptions.

The facts in the case are sufficiently stated in the opinion.

*G. F. Shepley*, for the plaintiff.

I. Are railroad corporations exempt from accountability for the improper, violent, and unlawful acts of their servants or agents, when acting in the scope of their employment?

1. " A master is liable for the tortious acts of his servants, when done in the course of his employment, although in disobedience of the master's orders." *Phil. & Reading R. R. Co.* v. *Derby*, 14 Howard, 468.

Certainly, in all cases where an individual master would be responsible. *First Baptist Church* v. *S. & T. R. R. Co.*, 5 Barbour, Ct. Rep., N. Y. 79.

*Respondeat superior*, is the universal rule whether the act is one of omission or commission, if done in the course of the servant's employment.

2. The fact that the master did not authorize or even know of

the tortious act, or did not ratify it, or if he even disapproved of and forbade it, makes no difference. 14 Howard, p. 488. Story on Agency, § 452. Smith on Master and Servant, 152.

If a master directs his servant to drive slowly, but is disobeyed, and an injury results, he is nevertheless liable, because he has put it in his servant's power to mismanage the carriage by intrusting him with it. *Heath* v. *Wilson*, 9 Car. & Payne, 607, by Erskine, J.

3. The maxim must not be qualified, lest it be nullified. It is specially important to the public interest that railroad corporations should be held to the utmost strictness of it. The original blame, the *causa causans* of the mischief is in the corporation, by intrusting the lives and persons of their passengers to unsuitable persons, who will not submit to control; the proximate cause, the *ipsa negligentia*, is the disobedience of the servant so intrusted. 14 Howard, 487, by Grier, J.

4. By so doing, the master warrants the fidelity and good conduct of his servant. Story on Agency, p. 465, chap. 17, § 452.

And just the same, though the servant's conduct was contrary to orders and against the master's interest. Ibid., note 2.

5. And this, too, where the conductor, whose disobedience occasioned the injury, had the reputation of a careful and competent person, had received express orders, had never before disobeyed, and was discharged instantly for his misconduct. 14 Howard, 470.

If a coachman, driving his master and being ordered not to drive so fast, disobeys and thereby occasions an injury, the master is responsible, because he is still driving for his master, though driving badly. *Brown* v. *Copley*, 7 Mann. & Granger, 566; E. C. L., 566, by Cresswell, J.

The case *Wright* v. *Wilcox*, 19 Wendell, 343, is not good law. *Howe* v. *Newmarch*, 12 Allen, 52, cited by defendant on p. 1 of his exceptions. Reeve on Domestic Relations, 357, 358. Redfield on Railways, 384, note. Smith on Master and Servant, 172 et seq.

6. The instruction given toward the end of p. 5 is certainly favorable enough for defendants. 12 Allen, 52, cited by defendants.

7. The distinction between trespass and case, occasioned much of the difficulty on this subject. Same case.

8. Where the business implies the use of force and violence to the person of another, and the servant commits a trespass in the course of his employment, the master is liable, although the trespass consists only in the use of excessive force. *Moore* v. *Fitchburg R. R.*, 4 Gray, 465. *Hewett* v. *Swett*, 3 Allen, 420.

In such case, it is left to the discretion of the servant to decide when the occasion arises to which the order applies, and the extent and kind of force to be used, and the master is liable, if in the execution of the order the servant uses force in a manner or to a degree unjustifiable. 12 Allen, 57, by Hoar, J., defendant's own case.

9. And that, too, whether the wrongful act was one of negligence, or was the effect of a wanton or reckless purpose to accomplish the master's business in an unlawful manner. Ibid.

And this is precisely the present case.

Jackson was not only brakeman but vice-conductor in charge of the rear car where plaintiff was imprisoned, with all the power of the chief conductor, Whitney, the full exercise of which was required of Jackson until Whitney arrived. See letter of Superintendent Bailey; Whitney's testimony; Bailey's testimony. Jackson was thus usually in command as conductor until after passing Falmouth; evidence of Whitney and Bailey; and, on this occasion, Jackson commanded in Whitney's absence until after passing Cumberland. See Burleigh's deposition and plaintiff's testimony,

Accordingly, Jackson was authorized to use force and violence as conductor, and did exercise all Whitney's power at Falmouth by demanding, receiving, and delivering to Whitney plaintiff's ticket at Falmouth station; and between Falmouth and Cumberland, perpetrating, as conductor, the outrage in question. See evidence of Burleigh and of plaintiff.

The authority of a conductor implies the use of force and violence to passengers attempting to ride without tickets or paying their fare, leaving it to the conductor's discretion to decide

when the occasion arises, and the nature and kind of force to use.

A plaintiff, put off a freight car by a conductor while the train was in motion, could not have maintained an action against the conductor, if he had been ejected by the use of reasonable force when the train was at rest, because the conductor had a right so to do; hence the corporation is liable for the unlawful force and vioence of the conductor. *Holmes* v. *Wakefield et als.*, 13 Allen, 580, by Judge Hoar.

That is to say, as Jackson, representing conductor Whitney, might lawfully have confined plaintiff in his seat until the arrival of Whitney for non-payment of fare or non-production of ticket, using reasonable force, therefore the corporation that employs him is liable for his unlawful exhibition of force to plaintiff, when in fact he had paid for and surrendered his ticket.

10. The jury were properly instructed, as matter of law, that under a given state of facts, the servant was in the course of his employment. *Drew* v. *Sixth Av. R. R.*, 40 N. Y. 429.

II. Of the rule of damages.

1. Plaintiff should be fully compensated for the injury received, —the injury to his feelings, for his wounded pride, mental pain and sufferings, and the feeling of degradation resulting from such a public, brutal, unprovoked, and prolonged assault. *Wadsworth* v. *Treat*, 43 Maine, 143.

2. Punitory, exemplary, or vindictive damages are allowable when the injury is wanton, malicious, and committed in reckless disregard of the rights of the injured party. *Pike* v. *Dilling*, 48 Maine, 539, A. D. 1861.

The opinion of the present chief justice, sustaining the ruling of Mr. Justice Cutting, contains so thorough and exhaustive a review of the decisions in England and in this country, that a reference to earlier authorities would be a work of supererogation.

Since that time, however, Messrs. Sedgwick, Hilliard, and other leading elementary writers, who have published new works or new

editions, as well as, the federal courts, and those of nearly all the States, have steadily maintained the principle of exemplary damages. Sedgwick on the Measure of Damages, chap. 18.

That this is the main element in all actions of *per quod servitium amisit*, is demonstrated with great force and clearness in *McBride* v. *McLaughlin*, 5 Watts, 375.

Also, that evidence of defendant's wealth can be allowable only on the same principle. Ibid.

That corrective damages may be given for the sake of example, is as old as the law itself. Sedgwick, p. 530, ed. of 1868.

Do not all *qui tam* actions, and those where, as in the statute against gambling-houses, the whole penalty goes to the successful informer, rest on the same basis?

The instruction on this point was in strict conformity to law, and extremely well guarded. 7th Circ. O., 1842, *Peck* v. *Neil*, 3 McLean, 22.

III. Such being the law, shall these defendants be permitted to escape its salutary provisions?

1. If it be said that the outrage was committed by Jackson, and not by defendant corporation personally, this is only true in a physical sense; because a corporation has no material body with which to perpetrate its crimes, any more than it has a soul to suffer for, or a conscience to be ashamed of them. In reality the assertion is false, because a corporation can act only through its servants, and its servants' acts are its only acts, its servants' will its only will, except, perhaps, in the case of the votes of its members at a stockholders' meeting.

The Grand Trunk Railway Company of Canada was personally present in the rear car of that passenger train, in the person and only in the person of its recognized representative, vice-conductor Jackson,—and his will and his acts were, in law and in fact, its will and acts, and its only will and acts on that occasion.

If, therefore, an individual master, perhaps personally innocent of positive evil intent, is liable to punishment by exemplary dam-

ages for the malice of his servant, for a much stronger reason ought a soulless corporation to be held responsible for the wicked and wanton acts of its sole representative.

Besides, if corporations cannot be reached in exemplary damages for the malice of their servants, they escape entirely, and thus stand infinitely better than citizens, who are liable in punitory damages, not only for the malicious acts of their agents, but for their own personal acts, which latter it is obvious a corporation can never be guilty of, in the strict sense.

Corporations are subject to the same liability as common individuals. Angell and Ames on Corporations, ch. 11, p. 333. Redfield on Railways, vol. 2, § 187, p. 331, note 1.

And the disobedience of the agent makes no difference, if he was acting within the scope of his employment. Ibid. § 164, p. 116, clause 8.

These very defendants have been taught this principle in their own proper person by the supreme court of N. H. *Hopkins* v. *A. & St. L. R. R.*, 36 N. H. 9. Redfield, vol. 2, § 183, p. 220, note 2.

IV. The damage considered as punitory was not only not excessive, but it is now at this hearing apparent to the court to be insufficient. It has not produced the effect of causing the corporation to discharge from its service the offending servant, who is still in its employment, and has been promoted. The court is not informed, the public and the injured party are alike ignorant of the grounds of this unprovoked assault. This corporation, with its immense capital, defies the court, the jury, and the public, by its obstinate neglect and refusal even after verdict, to apologize for, or explain the transaction. It produces in court the assailant, still an employee of the company, neglects even to call him as a witness or any other witness to disprove their actual malice, and thus leaving the fair inference that they approve and justify, if they did not directly order the acts of violence to the passenger,—ask the court to say that the damages returned by the jury were greater than necessa-

ry for the public protection, while at the same time their own acts show before the court that they were insufficient.

V. The learned judge rightly refused to instruct the jury to measure their damages by a hypothetical suit against Jackson, not only for the reason given by him which was sufficient, but because it would have been intrinsically bad law.

We have seen that the theory of exemplary damages involves the question of a defendant's wealth. *McBride* v. *McLaughlin*, 5 Watts, 375.

The defendant's wealth may be given in evidence. Greenl. on Ev., vol. 2, p. 221.

Especially where it was proved that the defendant was amply able to pay for it. Hilliard on Remedies for Torts, chap. 7, p. 453, § 1.

Therefore damages which would be absurdly, nay, oppressively large, as against a worthless, brutal fellow, whom no person or corporation in the world but one, would retain in its employment, would be ridiculously and contemptibly small when inflicted either as punishment or example, on his employers and retainers with a capital of eighty millions in gold, an annual income of more than half a million pounds sterling, and a line nearly one thousand miles long.

The authorities will be found by a preponderance to establish the following propositions:

1. The master is liable in a civil suit of trespass, or trespass on the case for the tortious acts of his servant done in the scope of his employment.

2. The fact of the tortious act having been done in disobedience of express orders, and without subsequent approval or ratification, makes no difference.

3. Nor whether the purpose of the servant was malicious except so far as the amount of damages.

4. Railroad corporations stand on no better footing than individuals in any of these particulars.

5. Under a given state of facts, the court may rightly instruct the jury, as matter of law, that the servant was in the course of his employment.

6. In the present case the judge correctly instructed the jury on the facts supposed.

7. In case of malicious personal tort, the jury are authorized to give punitory or exemplary damages.

8. The instruction on this point was correct, and very carefully guarded.

9. A corporation is liable to punitory damages at least as fully as an individual master.

10. In fact, a very large and increasing proportion of the later cases of punitory damages have been inflicted on railroad corporations, and that, too, without proof of previous knowledge or subsequent approval of the tortious act by any other officer of the defendant corporation than the offending servant.

Finally. All the instructions of the presiding justice were correct, or at least sufficiently favorable to defendants.

*P. Barnes*, for the defendants, cited *Derby* v. *Penn. R. R. Co.* 14 How. 468, and cases there cited; *Howe* v. *Newmarch*, 12 Allen, 56; Reeves' Dom. Relations, 356, 358; *Foster* v. *Essex Bank*, 17 Mass. 508; 2 Kent's Com. 259, 260; Story on Agency, § 318; *Brown* v. *Purviance*, 2 Harris & Gill. 317; *Lyons* v. *Martin*, 8 Ad. & Ellis, 514; *Thames Steam Boat Co.* v. *R. R. Co.*, 24 Conn. 40; 1 Redfield on Railways, 510–515; *Pote* v. *Dill*, 48 Maine, 539, Rice's dissenting opinion; *Higan* v. *Prov. & Wor. R. R. Co.*, 3 Rhode Island, 188; *Turner* v. *N. B. & M. R. R. Co.*, 34 Cal. 594; *Pleasant* v. *N. B. & M. R. R. Co.*, 34 Cal. 586; *Finny* v. *Mil. & Wis. R. R. Co.* 10 Wis., 388; *Clark* v. *Newson*, 1 Exch. 131; *Montfort* v. *Wordsworth*, 7 Ind. 83; *Ripley* v. *Miller*, 11 Ind. 247.

WALTON, J. Two questions are presented for our consideration: first, is the common carrier of passengers responsible for the willful misconduct of his servant? or, in other words, if a passenger

who has done nothing to forfeit his right to civil treatment, is assaulted and grossly insulted by one of the carrier's servants, can he look to the carrier for redress? and, secondly, if he can, what is the measure of relief which the law secures to him? These are questions that deeply concern, not only the numerous railroad and steamboat companies engaged in the transportation of passengers, but also the whole travelling public; and we have endeavored to give them that consideration which their great importance has seemed to us to demand.

I. Of the carrier's liability. It appears in evidence, that the plaintiff was a passenger in the defendants' railway car; that, on request, he surrendered his ticket to a brakeman employed on the ·train, who, in the absence of the conductor, was authorized to demand and receive it; that the brakeman afterwards approached the plaintiff, and, in language coarse, profane, and grossly insulting, denied that he had either surrendered or shown him his ticket; that the brakeman called the plaintiff a liar, charged him with attempting to avoid the payment of his fare, and with having done the same thing before, and threatened to split his head open and spill his brains right there on the spot; that the brakeman stepped forward and placed his foot upon the seat on which the plaintiff was sitting, and, leaning over the plaintiff, brought his fist close down to his face, and shaking it violently, told him not to yip, if he did he would spot him, that he was a damned liar, that he never handed him his ticket, that he did not believe he paid his fare either way; that this assault was continued some fifteen or twenty minutes, and until the whistle sounded for the next station; that there were several passengers present in the car, some of whom were ladies, and that they were all strangers to the plaintiff; that the plaintiff was at the time in feeble health, and had been for some time under the care of a physician, and at the time of the assault was reclining languidly in his seat; that he had neither said nor done anything to provoke the assault; that, in fact, he had paid his fare, had received a ticket, and had surrendered it to this very brakeman

who delivered it to the conductor only a few minutes before, by whom it was afterwards produced and, identified; that the defendants were immediately notified of the misconduct of the brakeman, but, instead of discharging him, retained him in his place; that the brakeman was still in the defendants' employ when the case was tried and was present in court during the trial, but was not called as a witness, and no attempt was made to justify or excuse his conduct.

Upon this evidence the defendants contend that they are not liable, because, as they say, the brakeman's assault upon the plaintiff was willful and malicious, and was not directly nor impliedly authorized by them. They say the substance of the whole case is this, that "the master is not responsible as a trespasser, unless by direct or implied authority to the servant, he consents to the unlawful act."

The fallacy of this argument, when applied to the common carrier of passengers, consists in not discriminating between the obligation which he is under to his passenger, and the duty which he owes a stranger. It may be true that if the carrier's servant willfully and maliciously assaults a stranger, the master will not be liable; but the law is otherwise when he assaults one of his master's passengers. The carrier's obligation is to carry his passenger safely and properly, and to treat him respectfully, and if he intrusts the performance of this duty to his servants, the law holds him responsible for the manner in which they execute the trust. The law seems to be now well settled that the carrier is obliged to protect his passenger from violence and insult, from whatever source arising. He is not regarded as an insurer of his passenger's safety against every possible source of danger; but he is bound to use all such reasonable precautions as human judgment and foresight are capable of, to make his passenger's journey safe and comfortable. He must not only protect his passenger against the violence and insults of strangers and co-passengers, but a fortiori, against the violence and insults of his own servants. If this duty to the passenger is not performed, if this protection is not furnished, but, on the contrary, the passenger is assaulted and insulted, through the

negligence or the willful misconduct of the carrier's servant, the carrier is necessarily responsible.

And it seems to us it would be cause of profound regret if the law were otherwise.   The carrier selects his own servants and can discharge them when he pleases, and it is but reasonable that he should be responsible for the manner in which they execute their trust.   To their care and fidelity are intrusted the lives and limbs and comfort and convenience of the whole traveling public, and it is certainly as important that these servants should be trustworthy as it is that they should be competent.   It is not sufficient that they are capable of doing well, if in fact they choose to do ill; that they can be as polite as a Chesterfield, if, in their intercourse with the passengers, they choose to be coarse, brutal, and profane.   The best security the traveler can have that these servants will be selected with care, is to hold those by whom the selection is made responsible for their conduct. ·· ·

This liability of the master is very clearly expressed in a recent case in Massachusetts.   The court say, that wherever there is a contract between the master and another person, the master is responsible for the acts of his servant in executing that contract, although the act is fraudulent and done without his consent.   *Howe* v. *Newmarch*, 12 Allen, 55.   (Paragraph nearest the bottom of the page.)

And Messrs. Angell and Ames, in their work on corporations (section 388, p. 404, eighth edition), say: " A distinction exists as to the liability of a corporation for the willful tort of its servant toward one to whom the corporation owes no duty except such as each citizen owes to every other; and that toward one who has entered into some peculiar contract with the corporation by which this duty is increased; thus it has been held that a railroad corporation is liable for the willful tort of its servants whereby a passenger on the train is injured."

In *Brand* v. *Railroad*, 8 Barb. 368, the court say, a passenger on board a stage-coach or railroad-car, and a person on foot in the street, do not stand in the same relation to the carrier.   Toward

the one the liability of the carrier springs from a contract, express or implied, and upheld by an adequate consideration. Toward the other he is under no obligation but that of justice and humanity. Hence a passenger, who is injured by a servant of the carrier, may have a right of action against him when one not a passenger, for a similar injury, would not.

In *Moore* v. *Railroad*, 4 Gray, 465, the plaintiff was forcibly put out of a car for not giving up his ticket or paying his fare, when in fact he had already surrendered his ticket to some one employed on the train. The defendants insisted that they were not responsible for the misconduct of the conductor; and further, that an action for an assault would not lie against a corporation. But the court held otherwise, and the plaintiff recovered.

In *Seymour* v. *Greenwood*, 7 Hurl. & Nor. 354, the plaintiff was assaulted and taken out of the defendant's omnibus by one of his servants. The defendant insisted that he was not liable, because it did not appear that he authorized or sanctioned the act of the servant. But it was held in the exchequer chamber, affirming the judgment of the exchequer court, that the jury did right in returning a verdict for the plaintiff.

In *Railroad* v. *Finney*, 10 Wis. 388, the plaintiff was unlawfully put out of a car by the conductor. After stating that it was insisted, by the counsel for the railroad, that in no case could a cause of action arise against the principal for the willful misconduct of the agent, the court went on to say, that after a careful examination of the position, they were satisfied it was not correct; that where the misconduct of the agent causes a breach of the principal's contract, he will be liable whether such misconduct be willful or merely negligent.

In *Railroad* v. *Vandiver*, 42 Penn. St. R. 365, a passenger received injuries, of which he died, by being thrown from the platform of a railroad car because he refused to pay his fare or show his ticket, he averring he had bought one but could not find it. The evidence showed he was partially intoxicated. It was urged in defense that if the passenger's death was the result of force and

violence, and not the result of negligence, then (such force and violence being the act of the agents alone without any command or order of the company) the company was not responsible therefor. But the court held otherwise. "A railway company," said the court, "selects its own agents at its own pleasure, and it is bound to employ none except capable, prudent, and humane men. In the present case the company and its agents were all liable for the injury done to the deceased."

In *Weed* v. *Railroad,* 17, N. Y. 362, the jury found specially that the act of the servant by which the plaintiff was injured, was willful. The court held the willfulness of the act did not defeat the plaintiff's right to look to the railroad company for redress.

In *Railroad* v. *Derby,* 14 Howard, 468, where the servant of a railroad company took an engine and run it over the road for his own gratification, not only without consent, but contrary to express orders, the supreme court of the United States held that the railroad company was responsible.

In *Railway* v. *Hinds,* 53 Penn. 512, a passenger's arm was broken in a fight between some drunken persons that forced their way into the car at a station near an agricultural fair, and the company was held responsible, because the conductor went on collecting fares, and did not stop the train and expel the rioters, or demonstrate, by an earnest effort, that it was impossible to do so.

In *Flint* v. *Transportation Co.,* 34 Conn. 554, where the plaintiff was injured by the discharge of a gun dropped by some soldiers engaged in a scuffle, the court held that passenger carriers are bound to exercise the utmost vigilance and care to guard those they transport from violence from whatever source arising; and the plaintiff recovered a verdict for $10,000.

In *Landreaux* v. *Bell,* 5 Louisiana, O. S. 275, the court say, that carriers are responsible for the misconduct of their servants toward passengers to the same extent as for their misconduct in regard to merchandise committed to their care; that no satisfactory distinction can be drawn between the two cases.

In *Chamberlain* v. *Chandler,* 3 Mason 242, Judge Story declared

in language strong and emphatic, that a passenger's contract entitles him to respectful treatment; and he expressed the hope that every violation of this right would be visited, in the shape of damages, with its appropriate punishment.

In *Nieto* v. *Clark*, 1 Clifford 145, where the steward of the ship assaulted and grossly insulted a female passenger, Judge Clifford declares, in language equally emphatic, that the contract of all passengers entitles them to respectful treatment and protection against rudeness and every wanton interference with their persons from all those in charge of the ship; that the conduct of the steward disqualified him for his situation, and justified the master in immediately discharging him, although the vessel was then in a foreign port. And we have his authority for saying that he has recently examined the question with care, in a case pending in the Rhode Island district, where the clerk of a steamboat unjustifiably assaulted and maltreated a passenger, and that he entertains no doubt of the carrier's liability to compensate the passenger for the injury thus received, whether the carrier previously authorized or subsequently ratified the assault or not. A report of the case will soon be published. (See 3 Clifford.)

And a recent and well-considered case in Maryland (published since this case has been pending before the law court, and very much like it in all respects), fully sustains this view of the law. *Railroad* v. *Blocher*, 27 Md. 277.

The grounds of the carrier's liability may be briefly stated thus:

The law requires the common carrier of passengers to exercise the highest degree of care that human judgment and foresight are capable of, to make his passenger's journey safe. Whoever engages in the business impliedly promises that his passenger shall have this degree of care. In other words, the carrier is conclusively presumed to have promised to do what, under the circumstances, the law requires him to do. We say conclusively presumed, for the law will not allow the carrier by notice or special contract even to deprive his passenger of this degree of care. If the passenger does not have such care, but on the contrary is unlawfully assaulted

and insulted by one of the very persons to whom his conveyance is intrusted, the carrier's implied promise is broken, and his legal duty is left unperformed, and he is necessarily responsible to the passenger for the damages he thereby sustains. The passenger's remedy may be either in assumpsit or tort, at his election. In the one case, he relies upon a breach of the carrier's common-law duty in support of his action; in the other, upon a breach of his implied promise. The form of the action is important only upon the question of damages. In actions of assumpsit, the damages are generally limited to compensation. In actions of tort, the jury are allowed greater latitude, and, in proper cases, may give exemplary damages.

II. We now come to the second branch of the case. What is the measure of relief which the law secures to the injured party; or, in other words, can he recover exemplary damages? We hold that he can. The right of the jury to give exemplary damages for injuries wantonly, recklessly, or maliciously inflicted, is as old as the right of trial by jury itself; and is not, as many seem to suppose, an innovation upon the rules of the common law. It was settled in England more than a century ago.

In 1763, Lord Chief Justice Pratt (afterwards Earl of Camden), with whom the other judges concurred, declared that the jury had done right in giving exemplary damages. *Huckle* v. *Money,* 2 Wilson, 205.

In another case the same learned judge declared with emphasis, that damages are designed not only as a satisfaction to the injured person, but likewise as a punishment to the guilty. Campbell's Lives of the Chancellors, Am. edition, vol. 5, p. 214.

In 1814, the doctrine of punitive damages was stringently applied in a case where the defendant, in a state of intoxication, forced himself into the plaintiff's company, and insolently persisted in hunting upon his grounds. The plaintiff recovered a verdict for five hundred pounds, the full amount of his *ad damnum,* and the court refused to set it aside. Mr. Justice Heath remarked in this case that he remembered a case where the jury gave five hundred

pounds for merely knocking a man's hat off, and the court refused a new trial. It goes, said he, to prevent the practice of dueling, if juries are permitted to punish insult by exemplary damages. *Merest* v. *Harvey*, 5 Taunt. 442. See also, to the same effect, *Sears* v. *Lyon*, 2 Starkie, 317, decided in 1818.

In 1844, Lord Chief Baron Pollock said, that in actions for malicious injuries, juries had always been allowed to give what are called vindictive damages. *Doe* v. *Filliter*, 13 M. & W. 50.

In 1858, in an action of trespass for taking personal property on a fraudulent bill of sale, the defendant's counsel contended that it was not a case for the application of the doctrine of exemplary damages; but the court held otherwise. No doubt, said Pollock, C. B., it was a case in which vindictive damages might be given. *Thomas* v. *Harris*, 3 H. & N. 961.

In 1860, in an action for willful negligence, the defendant contended that the plaintiff's declaration was too defective to entitle him to exemplary damages; but the court held otherwise; and the judge who tried the case remarked that he was glad the court had come to the conclusion that it was competent for the jury to give exemplary damages, for he thought the defendant had acted with a high hand. *Emblen* v. *Myers*, 6 H. & N. 54.

"Damages exemplary," is now a familiar title in the best English law reports. See 6 H. & N. 969.

It was the firmness with which Lord Camden (then Chief Justice Pratt) maintained and enforced the right of the jury to punish with exemplary damages the agents of Lord Halifax (then Secretary of State) for the illegal arrest of the publishers of the North Briton, that made him so immensely popular in England. Nearly or quite twenty of those cases appear to have been tried before him, in all of which enormous damages were given, and in not one of them was the verdict set aside. In one of the cases a verdict for a thousand pounds was returned for a mere nominal imprisonment at the house of the officer making the arrest, and the court refused to set it aside. *Beardmore* v. *Carrington*, 2 Wilson, 244.

"After this," says Lord Campbell, in his Lives of the Chancel-

lors," he became the idol of the nation. Grim representations of him laid down the law from sign-posts, many busts and prints of him were sold not only in the streets of the metropolis, but in the provincial towns; a fine portrait of him, by Sir Joshua Reynolds, with the flattering inscription, " in honor of the zealous asserter of English liberty by law," was placed in the Guildhall of the city of London; addresses of thanks to him poured in from all quarters; and one of the sights of London, which foreigners went to see, was the great Lord Chief Justice Pratt."

In this country, perhaps Lord Camden is better known as one of the able English statesmen who so eloquently defended the American colonies against the unjust claim of the mother country to tax them. Lord Campbell says some portions of his speeches upon that subject are still in the mouths of school-boys. But in England his immense popularity originated in his firm and vigorous enforcement of the doctrine of exemplary damages. And we cannot discover that the legality of his rulings in this particular was ever seriously called in question. On the contrary, we find it admitted by his political opponents that he was a profound jurist and an able and upright judge. His stringent enforcement of the right of the jury to punish flagrant wrongs with exemplary damages, arrested not only great abuses then existing, but it has had a salutary influence ever since. It won for him the title of the " asserter of English liberty by law."

In this country the right of the jury to give exemplary damages has been much discussed. It seems to have been first opposed by Mr. Theron Metcalf (afterwards reporter and judge of the supreme court of Massachusetts), in an article published in 3 American Jurist, 387, in 1830. The substance of this article was afterwards inserted in a note to Mr. Greenleaf's work on Evidence. Mr. Sedgwick, in his work on Damages, took the opposite view, and sustained his position by the citation of numerous authorities. Professor Greenleaf replied in an article in the Boston Law Reporter, vol. 9, p. 529. Mr. Sedgwick rejoined in the same periodical, vol. 10, p. 49. Essays on different sides of the question were

also published in 3 American Law Magazine, N. S. 537, and 4 American Law Magazine, N. S. 61. But notwithstanding this formidable opposition, the doctrine triumphed, and must be regarded as now too firmly established to be shaken by anything short of legislative enactments. In fact the decisions of the courts are nearly unanimous in its favor.

In a case in the supreme court of the United States, Mr. Justice Grier, in delivering the opinion of the court, says, it is a well-established principle of the common law, that in all actions for torts the jury may inflict what are called punitive or exemplary damages, having in view the enormity of the offense rather than the measure of compensation to the plaintiff. "We are aware," the judge continues, "that the propriety of this doctrine has been questioned by some writers; but if repeated judicial decisions for more than a century are to be received as the best exposition of what the law is, the question will not admit of argument." *Day* v. *Woodworth*, 13 Howard, 363.

In a case in North Carolina, the court refer to the note in Professor Greenleaf's work on Evidence, and say that it is very clearly wrong with respect to the authorities; and in their judgment wrong on principle; that it is fortunate that while juries endeavor to give ample compensation for the injury actually received, they are also allowed such full discretion as to make verdicts to deter others from flagrant violations of social duty. And the same court hold that the wealth of the defendant is a proper circumstance to be weighed by the jury, because a thousand dollars may be a less punishment to one man than a hundred dollars to another. In one case the same court sustained a verdict which in terms assessed the actual damages at $100, and the exemplary damages at $1,000. The court held it was a good verdict for $1,100. *Pendleton* v. *Davis*, 1 Jones (N. C.), 98. *McAulay* v. *Birkhead*, 13 Iredell, 28. *Gilreath* v. *Allen*, 10 Iredell, 67.

In fact, Professor Greenleaf is himself an authority for the doctrine of exemplary damages. Speaking of the action for assault and battery. he says the jury are not confined to the mere corporal

injury, but may consider the malice of the defendant, the insulting character of his conduct, the rank in life of the several parties, and all the circumstances of the outrage, and thereupon award such exemplary damages as the circumstances may in their judgment require.   2 Greenl. on Ev., § 89.

But if the great weight of Professor Greenleaf's authority were to be regarded as opposed to the doctrine, we have, on the other hand, the great weight of Chancellor Kent's opinion in favor of it.   He says, surely this is the true and salutary doctrine.   And after reviewing the English cases, he continues by saying it cannot be necessary to multiply instances of its application; that it is too well settled in practice, and too valuable in principle to be called in question.   *Tillotson* v. *Cheetham*, 3 Johnson, 56 and 64.

This brief review of the doctrine of exemplary damages is not so much for the purpose of establishing its existence, as to correct the erroneous impression which some members of the legal profession still seem to entertain, that it is a modern invention, not sanctioned by the rules of the common law.   We think every candid-minded person must admit that it is no new doctrine; that its existence as a fundamental rule of the common law has been recognized in England for more than a century; that it has been there stringently enforced under circumstances which would not have allowed it to pass unchallenged, if any pretext could have been found for doubting its validity; and that in this country, notwithstanding an early and vigorous opposition, it has steadily progressed, and that the decisions of the courts are now nearly unanimous in its favor.   It was sanctioned in this State, after a careful and full review of the authorities, in *Pike* v. *Dilling*, 48 Me. 539, and cannot now be regarded as an open question.

But it is said that if the doctrine of exemplary damages must be regarded as established in suits against natural persons for their own willful and malicious torts, it ought not to be applied to corporations for the torts of their servants, especially where the tort is committed by a servant of so low a grade as a brakeman on a railway train, and the tortious act was not directly nor impliedly au-

thorized nor ratified by the corporation; and several cases are cited by the defendants' counsel, in which the courts seem to have taken this view of the law; but we have carefully examined these cases, and in none of them was there any evidence that the servant acted wantonly or maliciously; they were simply cases of mistaken duty; and what these same courts would have done if a case of such gross and outrageous insult had been before them, as is now before us, it is impossible to say; and long experience has shown that nothing is more dangerous than to rely upon the abstract reasoning of courts, when the cases before them did not call for the application of the doctrines which their reasoning is intended to establish.

We have given to this objection much consideration, as it was our duty to do, for the presiding judge declined to instruct the jury that if the acts and words of the defendants' servant were not directly nor impliedly authorized nor ratified by the defendant, the plaintiff could not recover exemplary damages. We confess that it seems to us that there is no class of cases where the doctrine of exemplary damages can be more beneficially applied than to railroad corporations in their capacity of common carriers of passengers; and it might as well not be applied to them at all as to limit its application to cases where the servant is directly or impliedly commanded by the corporation to maltreat and insult a passenger, or to cases where such an act is directly or impliedly ratified; for no such cases will ever occur. A corporation is an imaginary being. It has no mind but the mind of its servants; it has no voice but the voice of its servants; and it has no hands with which to act but the hands of its servants. All its schemes of mischief, as well as its schemes of public enterprise, are conceived by human minds and executed by human hands; and these minds and hands are its servants' minds and hands. All attempts, therefore, to distinguish between the guilt of the servant and the guilt of the corporation; or the malice of the servant and the malice of the corporation; or the punishment of the servant and the punishment of the corporation, is sheer nonsense; and only tends to confuse

the mind and confound the judgment.  Neither guilt, malice, nor suffering is predicable of this ideal existence, called a corporation. And yet under cover of its name and authority, there is in fact as much wickedness, and as much that is deserving of punishment, as can be found anywhere else.  And since these ideal existences can neither be hung, imprisoned, whipped, or put in the stocks,—since in fact no corrective influence can be brought to bear upon them except that of pecuniary loss,—it does seem to us that the doctrine of exemplary damages is more beneficial in its application to them, than in its application to natural persons.  If those who are in the habit of thinking that it is a terrible hardship to punish an innocent corporation for the wickedness of its agents and servants, will for a moment reflect upon the absurdity of their own thoughts, their anxiety will be cured.  Careful engineers can be selected who will not run their trains into open draws; and careful baggage men can be secured, who will not handle and smash trunks and band-boxes as is now the universal custom; and conductors and brakemen can be had who will not assault and insult passengers; and if the courts will only let the verdicts of upright and intelligent juries alone, and let the doctrine of exemplary damages have its legitimate influence, we predict these great and growing evils will be very much lessened, if not entirely cured.   There is but one vulnerable point about these ideal existences, called corporations ; and that is, the pocket of the monied power that is concealed behind them ; and if that is reached they will wince.   When it is thoroughly understood that it is not profitable to employ careless and indifferent agents, or reckless and insolent servants, better men will take their places, and not before.

It is our judgment, therefore, that actions against corporations, for the willful and malicious acts of their agents and servants in executing the business of the corporation, should not form exceptions to the rule allowing exemplary damages.  On the contrary, we think this is the very class of cases, of all others, where it will do the most good, and where it is most needed.   And in this conclusion we are sustained by several of the ablest courts in the country.

In a case in Mississippi, the plaintiff was carried four hundred yards beyond the station where he had told the conductor he wished to stop ; and he requested the conductor to run the train back, but the conductor refused, and told the plaintiff to get off the train or he would carry him to the next station. The plaintiff got off and walked back, carrying his valise in his hand. The plaintiff testified that the conductor's manner toward him was insolent, and the defendants having refused to discharge him, the jury returned a verdict for four thousand five hundred dollars, and the court refused to set it aside. They said the right of the jury to protect the public by punitive damages, and thus prevent these great public blessings from being converted into the most dangerous nuisances, was conclusively settled ; and they hoped the verdict would have a salutary influence upon their future management. *Railroad, in Error,* v. *Hurst,* 36 Miss. 660.

In New Hampshire, in an action against this identical road, where, through gross carelessness, there was a collision of the passenger train with a freight train, and the plaintiff was thereby injured, the judge at *nisi prius* instructed the jury that it was a proper case for exemplary damages ; and the full court sustained the ruling, saying it was a subject in which all the traveling public were deeply interested ; that railroads had practically monopolized the transportation of passengers on all the principal lines of travel, and there ought to be no lax administration of the law in such cases ; and that it would be difficult to suggest a case more loudly calling for an exemplary verdict. [If mere carelessness, however gross, calls loudly for an exemplary verdict, what shall be said of an injury that is willful and grossly insulting ?] *Hopkins* v. *At. &amp; St. Lawrence Railroad,* 36 New Hamp. 9.

Judge Redfield, in his very able and useful work on railways, expresses the opinion that there is quite as much necessity for holding these companies liable to exemplary damages as their agents. He says it is difficult to perceive why a passenger, who suffers indignity and insult from the conductor of a train, should be compelled to show an actual ratification of the act, in order to subject

the company to exemplary damages. (2 Redfield on Railways, 231, note.) But if such a ratification is necessary, he thinks the corporation, which is a mere legal entity, inappreciable to sense, should be regarded as always present in the person of its servant, and as directing and ratifying the servant's acts within the scope of his employment, and thus be made responsible for his willful misconduct. 1 Redfield on Railways, 515 *et seq.*

And in a recent case in Maryland (published since this case has been pending before the law court), a case in all respects very similar to the one we are now considering, the presiding judge was requested to instruct the jury that the plaintiff was not entitled to recover vindictive or punitive damages from the defendants, unless they expressly or impliedly participated in the tortious act, authorizing it before or approving it after it was committed; but the presiding justice refused so to instruct the jury, and the full court held that the request was properly rejected; that it was settled that where the injury for which compensation in damages is sought, is accompanied by force or malice, the injured party is entitled to recover exemplary damages. *Railroad* v. *Blocher*, 27 Md. 277.

But the defendants say that the damages awarded by the jury are excessive, and they move to have the verdict set aside and a new trial granted for that reason. That the verdict in this case is highly punitive, and was so designed by the jury, cannot be doubted; but by whose judgment is it to be measured to determine whether or not it is excessive? What standard shall be used? It is a case of wanton insult and injury to the plaintiff's character, and feelings of self-respect, and the damages can be measured by no property standard. It is a case where the judgment will be very much influenced by the estimation in which character, self-respect, and freedom from insult are held. To those who set a very low value on character, and think that pride and self-respect exist only to become objects of ridicule and sport, the damages will undoubtedly be considered excessive. It would not be strange if some such persons, measuring the sensibilities of others by their own low standard, should view this verdict with envy, and regret that some-

body will not assault and insult them, if such is to be the standard of compensation. While others, who feel that character and self-respect are above all price, more valuable than life itself even, will regard the verdict as none too large. We repeat, therefore, that it is a case where men's judgments will be likely to differ. And suppose the court is of opinion that the damages in this case are greater, much greater even, than they would have awarded, does it therefore follow that the judgment of the court is to be substituted for that of the jury? By no means. It is the wisdom of the law to suppose that the judgment of the jury is more likely to be right than the judgment of the court, for it is to the former and not to the latter that the duty of estimating damages is confided. Unless the damages are so large as to satisfy the court that the verdict was not the result of an honest exercise of judgment, they have no right to set it aside.

A careful examination of the case fails to satisfy us that the jury acted dishonestly, or that they made any mistake in their application of the doctrine of exemplary damages. We have no doubt that the highly punitive character of their verdict is owing to the fact that, after Jackson's misconduct was known to the defendants, they still retained him in their service. The jury undoubtedly felt that it was due to the plaintiff, and due to every other traveller upon that road, to have him instantly discharged; and that to retain him in his place, and thus shield and protect him against the protestation of the plaintiff, made to the servant himself at the time of the assault, that he would lose his place, was a practical ratification and approval of the servant's conduct, and would be so understood by him and by every other servant on the road.

And when we consider the violent, long-continued, and grossly insulting character of the assault; that it was made upon a person in feeble health, and was accompanied by language so coarse, profane, and brutal; that so far as appears it was wholly unprovoked; we confess we are amazed at the conduct of the defendants in not instantly discharging Jackson. Thus to shield and protect him in his insolence, deeply implicated them in his guilt. It was such in-

difference to the treatment the plaintiff had received, such indifference to the treatment that other travelers might receive, such indifference to the evil influence which such an example would have upon the servants of this and other lines of public travel, that we are not prepared to say the jury acted unwisely in making their verdict highly punitive. We cannot help feeling that if we should interfere and set it aside, our action would be most unfortunate and detrimental to the public interests. On the contrary, if we allow it to stand, we cannot doubt that its influence will be salutary. It will be an impressive lesson to these defendants, and to the managers of other lines of public travel, of the risk they incur when they retain in their service servants known to be reckless, ill-mannered, and unfit for their places. And it will encourage those who may suffer insult and violence at the hands of such servants, not to retaliate or attempt to become their own avengers, as is too often done, but to trust to the law and to the courts of justice, for the redress of their grievances. It will say to them, be patient and law-abiding, and your redress shall surely come, and in such measure as will not add insult to your previous injury.

On the whole, we cannot doubt that it is best for all concerned that this verdict be allowed to stand.

We see nothing in the rulings or charge of the presiding judge, of which the defendants can justly complain. And there is nothing to satisfy us that the jury were prejudiced or unduly biased; or that they made any mistake either as to the facts or the law. Our conclusion, therefore, is, that the exceptions and motion must be overruled.  *Motion and exceptions overruled.*

APPLETON, C. J.; DICKERSON, BARROWS, and DANFORTH, JJ., concurred.

TAPLEY, J., did not concur upon the question of damages, and gave his opinion as follows :

In so much of the opinion of Mr. Justice *Walton* as determines the question of the liability of the defendants to answer in damages

for the acts of the brakeman Jackson I concur; but I do not concur in sustaining the rulings of the court at the trial of the cause fixing the rule of damage for the jury; and I regard it so clearly wrong in principle, inequitable and unjust in practice, and so entirely wanting in precedent, that my duty requires something more than a silent dissent.

So much of the opinion as discusses the right of a jury to give in civil actions punitive damages, I do not propose now to review or express any opinion of or concerning, but it is to the application of the rule made in this case by the justice presiding at the trial of the cause. The rulings upon this matter are happily so clearly expressed and positive in terms, that no reasonable doubt concerning the proposition involved in them can be entertained. If by possibility any doubt could have arisen concerning them, the opinion he has drawn in the case sets them at rest.

The case shows that " on the subject of damages the presiding justice instructed the jury as follows: If the plaintiff has proved his case so that he is entitled to recover some damages, the question arises how much. That is a question which you must determine, being guided by the rules of law as I shall state them to you. In the first place, the plaintiff is entitled to such damages as he has actually suffered, and in estimating the amount, you will not be limited to what he has lost in dollars and cents. In fact, there is no evidence that he has suffered pecuniarily to any extent. You are to consider the injury to his feelings, his wounded pride, his wounded self-respect, his mental pain and suffering, occasioned by the assault, and the feeling of degradation that necessarily resulted from it. There are few men probably that would not rather suffer a severe pecuniary loss than a personal and insulting assault. Hence if one man should spit in another's face in public, the jury would not be limited to ten cents damages on the ground that that sum would pay him for washing his face. A man's feelings, self-respect, and pride of character are as much under the protection of the law in such case as his property. And in estimating the damages for a personal assault attended with opprobrious and insulting language, the jury have a

right to consider the character and standing of the person assaulted, and the injury to his feelings, as well as the injury to his person, and then to give him such damages as, in view of all the circumstances, will be a just compensation for the injury actually suffered. This amount must be left, in every case, to the sound judgment and discretion of the jury."

Pausing at this point of the instructions, we shall notice that they embrace all the elements of compensatory damages recognized by courts of the most liberal views in these matters; and embrace elements which many courts denominate exemplary; and they are stated in so clear and concise a manner, and accompanied by so forcible an illustration, that had they stopped at this point the plaintiff might well have expected his verdict to cover the utmost his injuries would warrant. With the rule thus far I am content, although carrying it to the very verge and utmost limit of precedent. I call attention to it at this point to show that the jury had, at this time, instructions which covered all the tangible and intangible elements of assessment in such cases. Instructions which if adhered to and followed by the jury restore him to the condition in which the assaulting party found him, so far as money can do it. Under these instructions he is to be made whole in the eyes of the law, just as if the injury had not been done; in every particular compensated so far as money can do it; what is done beyond is not to compensate, it is not to meet mere speculative or intangible injuries, is not to give him anything due him, for he has his full desert. These elements reach everything he, as an individual, can claim by reason of any infringement of his rights.

These instructions having been given, so full, clear, and liberal, the presiding judge proceeds to give the next element of damage, which has not for its basis any injury, invasion of right or privilege, discomfort, inconvenience, or indeed anything relating to the plaintiff, or anything in which he has any interest above that possessed by every other member of the community. It is not act or deed, word or menace,—these have all been adjusted; but it is mere motive, thought, interest, and secret desire. Being evil, morally

wrong, somebody must be punished for their existence, and the judge says:

" There is also another important rule of law bearing upon the question of damages. If the injury was wanton, malicious, committed in reckless and willful disregard of the rights of the injured party, the law allows the jury to give what is called punitory or exemplary damages. It blends the interests of the injured party with those of the public, and permits the jury not only to give damages sufficient to compensate the plaintiff, but also to punish the defendants. I feel it my duty, however, to say, that you ought to be very cautious in the application of this rule. The law does not require you to give exemplary damages in any case, and where the damages which the plaintiff is entitled to recover in order to compensate him for the injury he has actually suffered is sufficient to punish the defendants, and serve as a warning and example to others, the jury ought not to give more. But if they think it is not enough, then the law allows them to add such further sum as will make it enough for that purpose. But they should be careful in fixing the amount not to allow more than is just and reasonable, and not to allow their judgment to be swerved by their passions. Defendants' counsel requested the presiding judge to instruct the jury, that the plaintiff is not entitled to recover against the defendant company, any greater damages than he might against Jackson himself, for the same cause of action upon similar evidence. Upon which request the presiding judge stated to the jury: I decline to give you such instruction. I have endeavored to give you the correct rules by which the damages, if any, are to be assessed in this case ; and I think you cannot rightfully be required to enter into a consideration of the damages which a party not now before the court, and has not therefore had an opportunity to be heard, ought to pay, and then measure the damages in this case which has been heard, by those which you think ought to be just in another which has not been heard; we will endeavor to decide this case right now, and when Jackson's case comes before us, if it ever does, we will endeavor to decide that right.

" Defendants' counsel further requested the presiding judge to instruct the jury, that if the jury find that the acts and words of Jackson were not directly nor impliedly authorized, nor ratified by the defendants, then the plaintiff is not in any event entitled to recover vindictive damages against the defendants, nor damages in the nature of smart-money, which request was not complied with, the presiding judge having already instructed the jury upon what state of facts the plaintiff would be entitled to such damages."

I have copied all the instructions "on the subject of damages;" it will be seen that these latter instructions are substantially that the jury having given full compensatory damages, may give others in their discretion to punish these defendants for the wanton, willful, and malicious act of their brakeman in assaulting a passenger, although they neither directly or impliedly authorized or ratified the act.

This proposition must be sustained, if at all, upon one of two grounds; either that it is competent to punish one man for the criminal intent of another, or that the malice of the brakeman in this case was that of the defendant corporation.

A brief notice of some of the authorities touching the liability of the master for the acts of his servant will, I think, show the ground of liability, the reason for the rule, and exhibit a marked distinction between the ordinary case of master and servant and the case at bar.

In Dane's Abridgment of American Law, vol. 2, chap. 59, art. 2, it is said : " The master is not liable for the willful, voluntary, or furious act of his servant." "If my servant distrain a horse lawfully by my order, and then use him, this conversion is his act, and trover lies against him; for my order extends only to distraining the horse, and not to using him; this is his own act."

" Nor is the master bound for the voluntary acts of his servants.; for if he be bound, servants may ruin their masters by willful acts; nor are willful acts, wrongs authorized by their masters."

" If I order my servant to do what is lawful, and he does more, he only is liable; it is his own act, otherwise he might ruin me,

and in such case there can be no express or implied command from me for what he does beyond his orders; and whenever the question is how far the master is liable for his servant's acts, the material inquiry must be, how far he expressly or impliedly authorized it."

" The master is liable for the negligent act of his servant, but not for his willful wrong; is liable in trover; for which rule several reasons may be given : (1) A willful wrong is the servant's own act. (2) To allow him by his willful tortious act to bind his master and subject him to damages, would be to allow servants a power to ruin their masters. (3) In such cases there is no command from the master expressed or implied to do a willful wrong."

In Bacon's Abr., vol. 4, title Master and Servant, it is said: " The master must also answer for torts, and injuries done by his servant in the execution of his authority.    But though a master is answerable for damages occasioned by the negligence or unskillfulness of his servant acting in the execution of his orders, yet he is not answerable in trespass for the willful act of his servant done in his absence, and without his direction or assent."

Chancellor Kent says: " The master is only answerable for the fraud of his servant while he is acting in his business, and not for fraudulent or tortious acts, or misconduct in those things which do not concern his duty to his master, and which when he commits, he steps out of the course of his service.    But it was considered in *McManus* v. *Cricket*, 1 East, 106, to be a question of great concern and of much doubt and uncertainty, whether the master was answerable in damages for an injury willfully committed by his servant while in the performance of his master's business, without the direction or assent of the master.    The court of K. B. went into an examination of all the authorities, and after much discussion and great consideration, with a view to put the question at rest, it was decided that the master was not liable in trespass for the willful act of his servant in driving his master's carriage against another, without his master's direction or assent.    The court considered that when the servant quitted sight of the object for which he was employed, and without having in view his master's orders, pursued

the object which his own malice suggested, he no longer acted in pursuance of the authority given him, and it was deemed so far a willful abandonment of his master's business. This case has received the sanction of the supreme court of Massachusetts and New York, on the ground that there was no authority from the master express or implied, and the servant in that act was not in the employ-ment of his master."

*Wright* v. *Wilcox,* 19 Wendall, 343, Cowen, J., who gave the opinion of the court, says: "If the act was willful, the master is no more liable than if his servant had committed any other assault and battery. All the cases agree that a man is not liable for the willful mischief of his servant, though he be at the time in other respects engaged in the service of the former." After citing several cases he adds: "Why is a master chargeable for the act of his servant? Because what a man does by another he does by himself. The act is not within the scope of his agency." He says: "The authorities deny that when the servant willfully drives over the man, he is in his master's business. They held it a departure, and going into the servant's own independent business."

In *Richmond Turnpike Co.* v. *Vanderbilt* (1 Hill, 480), case of a collision of steamboats, the supreme court held that if the collision was willful on the part of the defendant's servant, the defendant was not liable, referring to *Wright* v. *Wilcox.* The case afterward went to the court of appeals (2 Com. 479) where the doctrine applied in the supreme court was sanctioned; and it was further held that the corporation was not liable, although the willful act producing the injury was authorized and sanctioned by the president and general agent thereof; because a general or special agent, when he commits or orders a willful trespass to be committed, acts without the scope of his authority.

In *Hibbard* v. *N. Y. & Erie R. R. Co.* (15 N. Y. 455), which was "an action against the corporation for ejecting a passenger from the cars, who, having once exhibited his ticket, refused so to do when again requested by the conductor." Brown, J., in giving his opinion says, speaking of a requested instruction concerning

damages, "the object of the request was, that the court should discriminate between those acts of the company's agent done in the execution of its directions, and those done in the excess of its instructions and without authority or approbation. This I think should have been done. The plaintiff may have been injured by the use of unnecessary force to effect what the company had a right to do. The conductor and those who aided him are not the company. They are its agents and servants, and, whatever tortious acts they commit by its direction, it is responsible for and no other. This is upon the principle that what one does by another he does by himself. For injuries resulting from the carelessness of the servant in the performance of his master's business the latter is liable. But for the willful acts of the servant the master is not responsible, because such willful acts are a departure from the master's business;" and cites the case of *Wright* v. *Wilcox*, and cases there cited.

In the same case Comstock, J., says: "If the conductor had no right to eject the plaintiff from the train after he had complied with the request and produced the ticket, then I do not see upon what principle the defendants can be made liable for the wrong. The regulation and instructions to the conductor, as we have said, were lawful, and they did not in their terms or construction profess to justify the trespass and eviction. The result is, the wrong was done without any authority, and, therefore, that those who actually did it are alone unanswerable." "If he mistook the authority conferred upon him both when he committed the trespass and when he was examined as a witness, it cannot alter the law or change the rights of the parties. His own mistake as to the extent of his powers cannot make the railroad company liable for acts not in fact authorized." These cases are all cited in a subsequent case. *Weed* v. *The Panama R. R. Co.*, 17 N. Y. 362.

The rule is thus stated in Story's Agency, § 456. "But although the principal is liable for the torts and negligence of his agents, yet we are to understand the doctrine with its just limitations, that the tort or negligence occurs in the course of the agency.

For the principal is not liable for the torts or negligences of his agent in matters beyond the scope of the agency unless he has subsequently adopted them for his use or benefit. Hence it is that the principal is never liable for the unauthorized, the willful, or the malicious act or trespass of his agent."

Mr. Hilliard, in his work on Torts, says: " In general, a master is liable for the fault or negligence of his servant; but not for his willful wrong or trespass. The injury must arise in the course of the execution of some service lawful in itself, but negligently or unskillfully performed, and not be a wanton violation of law by the servant, although occupied about the business of his employer." Hilliard on Torts, c. 40.

In *Parsons* v. *Winchell*, 5 Cushing, 592, Metcalf, J., says: " But the act of a servant is not the act of a master even in legal intendment or effect unless the master personally directs or subsequently adopts it. In other cases, he is liable for the acts of his servant when liable at all, not as if the act were done by himself, but because the law makes him answerable therefor. He is liable, says Lord Kenyon, ' to make compensation for the damage consequential for his employing of an unskillful or negligent servant.' " (1 East, 108.)

Of this latter class of cases, Story says: " In every such case the principal holds out his agent as competent and fit to be trusted; and thereby, in effect, he warrants his fidelity and good conduct in all the matters of the agency." (Story on Agency, § 452.)

In *Southwick* v. *Estes*, 7 Cushing, 385, Dewey, J., instructed the jury " that if the act of the servant were not done negligently but willfully with the intention of disregarding the directions of the master, he would not be responsible therefor." This instruction was held correct, and the case of *McManus* v. *Crickett* was cited by the court.

In *Philadelphia, Wilmington & Baltimore R. R. Co.* v. *Langley*, 21 Howard, 202, Mr. Justice Campbell in delivering the opinion of the court says, " the result of the cases is that for acts done by the agents of a corporation either *in contractu* or *in delicto* in the course

of its business and of their employment, the corporation is responsible as an individual is responsible under similar circumstances."

In *Weed* v. *Panama R. R. Co.*, 17 N. Y. 362, this rule was invoked to relieve the defendants from the consequences of the willful act of the conductor in the detention of a train whereby a passenger was made sick and suffered permanent injury in her health.

Strong, J., in delivering the opinion of the court says: " The defendants insist that they are not liable for the willful act of the conductor followed by such a result; and they invoke, in support of their position, the rule, well sustained by principle and authority, that a master is not liable for a willful trespass of his servant." He then proceeds to say, "it is important, therefore, to inquire whether that rule extends to a case like the present, and for that purpose to consider the basis on which it is founded. The reason of the rule clearly appears by the cases in which it has been declared and applied." He then examines many of the cases where the rule has been stated and applied, and cites also Story on Agency, § 456, and then says: " All the cases on the subject, so far as I have observed, agree in regard to the principle of the rule, and also in limiting the rule to that principle. For acts of an agent within his authority, the principal is liable, but not for willful acts without his authority." (*Phil. & Read. R. R. Co.* v. *Derby*, 14 How. 468.) He then proceeds, in reference to the case then under consideration, to say : " In the light of this examination of the class of cases which has been considered, it cannot fail to be seen that there is an important difference between those cases and the one before the court." The former are cases of willful, unauthorized, wrongful acts by agents, unapproved by their principals, occasioning damage, but which do not involve nor work any omission or violation of duty by their principals to the persons injured; wrongs by the agents only with which the principals are not legally connected. In the present case, by means of the wrongful, willful detention by the conductor, the obligation assumed by the defendants, to carry the wife with proper speed to her destination, was broken. The real wrong to the wife in this case, and from which the damage pro-

ceeded, was the not carrying her in a reasonable time to Aspinwall as the defendants had undertaken to do, and this was a wrong of the defendants unless the law excused them for their delay on account of the misconduct of their agent." In the conclusion of his discussion he says, the rule of law, relied on by the defendants to sustain their position, is inapplicable to the case, and that it makes no difference whether the act was willful or negligent as to the liability of the defendants for a nonfulfillment of their contract. From an examination of these authorities, I think it will be found that the principal is liable for the act of his agent in three classes of cases:

I. Where the act is done by the previous command of the principal, or is subsequently ratified or adopted by him.

This command may appear from proof of specific directions, or implied from the circumstances of the case.

II. Where the agent negligently, unskillfully or otherwise improperly performs the duties pertaining to his employment.

III. Where the act of the agent has caused the breach of a contract, or prevented the performance of an obligation due from, and existing between, the principal and a third person.

The liability, in the first class of cases, rests solely upon the maxim, "*Qui facit per alium facit per se;*" and in no other cases is he liable as an actor, but in those cases where he has commanded the act or subsequently ratified it, which is regarded in law as a previous command.

The authorities, ancient and modern, are believed to be uniform upon this proposition, and wherever a liability attaches for an unauthorized act, it is founded upon some other reason.

In the second class the agent is held out as competent and fit to be trusted (by the principal), and he, in effect, warrants his fidelity and good conduct in all the matters of the agency; by reason of this, as Lord Kenyon says, he becomes liable "to make compensation for the damage consequential for his employing of an unskillful or negligent servant." As to whether this warranty covers the willful tortious acts of the agent while engaged in and about the

master's business, the authorities do not all agree. Some hold that as soon as the act becomes a willful trespass, the master is no longer liable ; others hold that for acts done in the course of his employment the master is responsible whatever may be the *animus* of the actor. A review of the authorities, touching this question, will be found in the case of *Evansville & Crawfordsville R. R. Co.* v. *Baum*, 26 Ind.

The liability, in the third class of cases, rests not upon the lawfulness or unlawfulness of the act done by the agent, but as grounded upon the failure of the principal to perform a contract or fulfill an obligation with the party injured. In this class of cases it matters not whether the act be a " willful trespass " or not ; whether it was done in the course of the employment of the servant is immaterial ; if the act produces the breach of the contract, or causes a failure to fulfill the existing obligation, the liability to answer attaches. The gravamen of the charge is not that the agent has done this or that act, but that the principal has not fulfilled his agreement.

That the case at bar comes within this class of cases I think there can be no doubt, and the liability of the defendants is well placed upon those grounds, by Mr. Justice Walton, and could be sustained upon no other.

In the light of these authorities and decisions, ancient and modern, emanating from courts of the highest jurisdiction, character, and ability, what is the true rule of damages in the case at bar ? Or, putting the question in a more pertinent form, were the defendants liable to punitory damages, such as " is sufficient to punish the defendants and serve as a warning and example to others."

If the act of Jackson was a willful, wanton, and malicious trespass upon his part, and was neither directly or impliedly authorized or ratified by the defendants, the act was neither in fact or legal, intendment the act of the defendants. This is quite clear from reason and authority. Although it may be one which devolved upon them a liability, it is in no sense their act ; so that, if ordinarily the malice of the acting agent was so inseparably connected with the

act that it would attach to the principal, *nolens volens*, in those cases where, by legal intendment, it was his, the principal's act, in this case it would not, it being neither in act or legal intendment the act of the defendants.

The requested instruction clearly presented the proposition that unless the act was authorized directly or impliedly, or subsequently ratified by the defendants, they could not be chargeable with the motive and intent of the actor. This was refused and the rule left, that, regardless of authorization or ratification, they might be punished for the willful, wanton, and malicious acts of Jackson.

The ruling, it is apparent, extends to cases not within the first class, and the result of placing it in either of the other classes is to punish one for the malice of another. To relieve the case from this difficulty an effort is made to make corporations an exception to the rule, although all the authorities, whether found in elementary treatises or judicial decisions, place them upon the same footing. The idea put forward seems to be, that the servant is the corporation. In order, however, that the position may certainly stand as it is made, and the argument proceed upon no erroneous deductions of mine, I quote: "A corporation is an imaginary being. It has no mind but the mind of its servants; it has no voice but the voice of its servants, and it has no hands with which to act but the hands of its servants. All its schemes of mischief, as well as its schemes of public enterprise, are conceived by human minds and executed by human hands, and those minds and hands are its minds and hands. All attempts, therefore, to distinguish between the guilt of the servant and the guilt of the corporation; or the malice of the servant and the malice of the corporation; or the punishment of the servant and the punishment of the corporation is 'sheer nonsense;' and only tends to confuse the mind and confound the judgment."

In relation to this proposition one inquiry may be made, viz.: Have these servants no "minds," no "hands," and no "schemes" except those of the corporation? Are all their schemes, all their acts, and all the emanations of their minds those of the corpora-

tion ?   If they have any other, shall the corporation be punished for them ?

Does not the argument attach a responsibility to the corporation for all the acts of a person in its employ ?   If it does not, where is the dividing line ?   It is all, or part.   What part ?   This is the question which law-writers and judges have been answering for many years, and whether, in the estimation of any, it be or not "sheer nonsense," they have distinguished between those acts of the agent for which the corporation is, and those for which it is not liable.

What its " voice " commands, what its " hands " do, and the " schemes " which it executes, it should be and is held responsible for, whether done by direct or implied authority or subsequently ratified by them ; and when they do this in wanton and willful disregard of the rights of others, they may, under the law as now administered, be punished by punitive damages.

But when the " voice " which speaks, and the " hand " which executes, is not that of the principal, however wanton, willful, and malicious it may be, the " stones," even, " cry out " against inflicting upon him a punishment therefor, and the more wanton and malicious the act, the more horrible is the doctrine.

Corporations are but aggregated individuals acting through the agency of man.   They may consist of a single individual, or more, and they are no more ideal beings when thus acting than the individual thus acting.   For certain acts the individual, though not manually engaged in it, is held responsible.   For the same acts the body of individuals, denominated a corporation, are held responsible. The principal and agent, in both cases, are separate and independant beings.   Agent presuppose a principal,—somebody to act for. Somebody whose orders they are to execute, and somebody for whom they are to perform service ; somebody who is answerable to them, and who may be answerable for the acts done under their direction.   Mr. Justice Brown, in *Hibbard* v. *N. Y. & Erie R. R. Co.*, before cited, says, "the conductor and those who aided him are not the company, they are its agents and servants."   If the employee and servant is the corporation, in fact or legal intendment,

it does not act through agents. Its acts are all the direct acts of principals without the intervention of any other power, and it carries us back to a responsibility for all the acts of a person employed by a corporation, whether those acts have any relation to his particular employment or not, a proposition too absurd and monstrous in its results to be entertained at all. Mr. Justice Campbell, in giving the opinion of the supreme court of the United States, in the case before cited (21 How. 202), says, the result of the cases is that for acts done in the course of its business and of their employment "the corporation is responsible; as an individual is responsible, under similar circumstances."

I, therefore, come to the conclusion that if liable at all to be punished for the malice of Jackson, it must be upon some other ground than their legal identity with him, and that in no sense can his malice be said to be their malice; and there seems to be strong indications in the charge of the presiding judge, that he, at that time, placed it upon no such grounds. The defendants, in view of this assumption by the plaintiff, "requested the presiding judge to instruct the jury that the plaintiff is not entitled to recover against the defendant company any greater damages than he might recover against Jackson himself, for the same cause of action upon similar evidence." This instruction the court declined to give, and remarked to the jury, "I think you cannot rightfully be required to enter into a consideration of the damages which a party, not now before the court, and has not, therefore, had an opportunity to be heard, ought to pay, and then measure the damages in this case which has been heard by those which you think might be just in another case which has not been heard. We will endeavor to decide this case right now, and when Jackson's case comes before us, if it ever does, we will endeavor to decide that right."

I think the argument is very strong from this remark, that it was not the malice and ill-will of Jackson that was designed to be punished, for he says his case has not been heard. The court say, substantially, we know not what excuses or justification he may offer when heard, if ever, "and when his case comes before us, if ever

it does, we will endeavor to decide that right." One would suppose that it was some "wanton, malicious act, committed in reckless and willful disregard of the rights of the injured party," by these defendants that was to receive such punishment as should "serve a warning and example to others," and not such an act done by Jackson. The argument would seem to proceed and say Jackson, for his act, may deserve one punishment, and those defendants, for their acts, may deserve another; and I cannot well forbear the inquiry here, if there is not here some evidence of an "attempt to distinguish between the guilt of the servant, and the guilt of the corporation; or the malice of the servant, and the malice of the corporation; or the punishment of the servant, and the punishment of the corporation?" Was it here that "sheer nonsense" was enacted, and "the mind confused," and the "judgment confounded."

If it was the malicious act of the defendants that was to be punished, the enormity of Jackson's wrong had indeed nothing to do with it. If it was the malicious wrong of Jackson that was to be punished, why should a party, innocent of all wrong in the matter, be punished more than the wrong-doer himself. If he was the corporation, why would not all the acts of extenuation and justification surrounding him be also the acts of the corporation, and be proper elements to be considered in graduating or fixing the penalty? How could his case come before us, if he was the corporation? Would it be to be punished for the act of the corporation?

If we hold both guilty and both liable, it must be founded upon the idea of two actors, and that the employee is not only the corporation but somebody else, and the nonentity of agent becomes itself a nonentity, and instead of a mere imaginary thing which swallows up and extinguishes all the relations of principal and agent, and renders any attempt to distinguish between them "sheer nonsense," we do have two distinct, independent, accountable subjects, susceptible of being brought before the courts to answer and be punished, and we are not left to the ideal action of punishing an ideal existence. Again; if the actor is brought before the court and punished, would he be punished for the act of the corporation or

his own act? for the malice of the corporation, or his own malice? If imprisoned, should we say the corporation was imprisoned?

If not, and he is (as undoubtedly he may be) called to answer for an assault, and punished for an assault, when we come to fix the punishment, do we not distinguish between his guilt and the guilt of the corporation, his malice and the malice of the corporation? And when the rule is required that we punish him in the same manner and to the same extent as the corporation, should we not reply very much as did the presiding judge at the trial? I think there can be no two opinions about the matter, and that there is manifestly a distinction between the two, and that there are two to distinguish between, and that when the act is authorized by any previous command or subsequent adoption, it is not, and cannot in the nature of things be made the act of another than the actor. Laws may be made making others responsible therefor, but it is the act of him who does it, and not of him who neither does or authorizes it; and no amount of judicial legislation or refinement can make it so; as before remarked, it is not possible in the nature of things.

Again; if this servant is the corporation, what becomes of the law regulating the liability of the principal for an injury received by an employee while in the business of the corporation. It is held, that if the injury was produced by the carelessness or negligence of the master or corporation, they must respond in damages; but if produced by the act of a fellow-servant, they are not liable. Is not here a distinction recognized between the guilt of the servant and the guilt of the corporation? Is not here a manifest distinction noted and acted upon between the servant and corporation? If the servant is the corporation, it is the act of the corporation when done by the fellow-servant. But these cases say, no. You assume the risks arising from the acts of your fellow-servants, but not the acts of your principal, the corporation; when the corporation is negligent you may recover, but when it is the servant, you cannot. Again, I ask, how can this be, if the servant is the corporation? This new idea, it appears to me, has in it more of ingenuity than logic

or substance ; it is altogether ideal, and if it finds place in the law, it will be among its fictions.

The learned judge then adds, "and it might as well not be applied to them at all, as to limit its application to cases where the servant is directly and specially directed by the corporation to maltreat and insult a passenger, or to cases where such an act is directly and specifically ratified; for no such cases will ever occur." The instruction requested and refused, used the term directly or " impliedly," and with this sentence so amended, I have simply to say, that if no such case ever does occur, there is no occasion, right, or propriety in inflicting the punishment. If the act is neither directly or impliedly authorized or ratified, there is in it no wantoness, no malice, and no ill-will toward the person injured, and no public wrong by them done to be redressed or atoned for. Repentance with them is absolutely impossible. The argument is simply this ; if we do not punish you when you do not directly or impliedly authorize or adopt a wrong, we shall never have ·an opportunity, for you never will thus authorize or adopt one. The argument is clearly stated by the learned judge, and I leave it as he left it, remarking, that if the end to be attained is the punishment of railroad corporations whether guilty or innocent, the rule requiring them first to be guilty of wrong had better be abolished.

That the learned judge meant to state his argument thus, is, I think, apparent from the remark which immediately follows : " that if those who are in the habit of thinking that it is a terrible hardship to punish an innocent corporation for the wickedness of its agents and servants, will for a moment reflect upon the absurdity of their own thoughts, their anxiety will be cured."

In *Evansville & Crawfordsville R. R. Co.* v. *Baum*, 26 Indiana, 70, the court say : " Nor will sound policy maintain the application of a rule to railways or corporations on this subject, which shall not be alike applied to others, as has been intimated in some quarters. The suggestion is not fit to be made, much less sanctioned, in any tribunal pretending to administer justice impartially."

In another case it is said, " The law lays down the same rule for

all, and we cannot make a different rule in the case of a servant of a railway company and an ordinary tradesman;" "and, therefore, treating Phillips as the servant, the company are not liable for his tortious act any more than other individuals would be." *Roe* v. *Birkenhead &c. R. R. Co.*, 7 Eng. Law and Eq., 547.

With the criticism (if it be entitled to that appellation) of the opinion upon railroads and their management I have, in the position I now occupy, no occasion to deal. My duty I consider performed, and best performed, when I have endeavored to ascertain the law as it is, and apply it to causes as they are presented, rather than in making rules for any real or supposed grievances. The law-making power is ample to afford the necessary means of redress where none now exists; and did these great and growing evils really exist, we might reasonably expect to find the law-makers, the people, those who must suffer by their existence, exercising their corrective powers.

If the evil is not sufficient to induce the sufferers to provide a remedy, it will hardly justify the judiciary in leaving the clear path of the duty of expounding the law, and assuming the powers and responsibilities of law-makers. Perhaps there has been no one thing that has introduced into the law so much confusion and embarrassment as the engrafting policy of courts; adding here a little and there a little, till the original is covered with these judicial excrescences; and not unfrequently the jewel is lost in its surroundings of dross.

The plaintiff, in the printed brief of his argument presented in this case, says, " If, therefore, an individual master, perhaps personally innocent of positive evil intent is liable to punishment by exemplary damages for the malice of his servant, for a much stronger reason ought a soulless corporation to be responsible for the wicked and wanton acts of its sole representative."

In my judgment, if the premise were right in this proposition, there is no reason why the conclusion is not right. But I know of no case where the master, innocent of all wrong upon his own part, has been held to be liable to punishment for the malice of his ser-

vant.   It is only where he has been a participator in some manner in the wantonness and malice displayed in the act, and it is his own wanton and malicious act that is then punished.   The plaintiff says further: " Besides, if corporations cannot be reached in exemplary damages for the malice of their servants, they escape entirely, and thus stand infinitely better than citizens who are liable in punitory damages, not only for their own personal acts, which latter it is obvious a corporation can never be guilty of in the strict sense."   If citizens were liable in punitory damages for the malice of their servants, in nowise participated in by themselves, the conclusion that corporations would stand better than ,citizens, if they escaped a punishment for the malice of their servants, is irresistible; but again I say, I know of no law, authority, or reason for holding an innocent citizen to punishment for the malice of his servant or agent.   It is quite as much as one can reconcile with just accountability to hold him to compensate for injuries maliciously inflicted in the course of his employment, without adding punishment.

The theory of punitive damages is the infliction of a punishment for an offense committed.   It presupposes the existence of a moral wrong, an infraction of the moral code; a wrong in which the community has some interest in the redress, and in securing immunity from in the future.   It presupposes also an offender, and designs to punish that offender.   To punish one not an offender is against the whole theory, policy, and practice of the law and its administrators.   " It is better that ten guilty men should escape than one innocent man should suffer."   Before the smallest fine can be inflicted, evidence, leaving no reasonable doubt of the guilt of the party to be thus punished, must be adduced.   Evidence that he possessed the evil intent, wicked and depraved spirit; that it was he that was regardless of social duty.   The idea of punishing one who is not *particeps criminis* in the wrong done is so entirely devoid of the first principles and fundamental elements of law, that it can never find place among the rules [of action in an intelligent and virtuous community.   There is no parallel, for it is in the administration of the law, and courts of the highest repute have, whenever

the question has arisen, declared it unsound in principle and inequitable in practice.

In *Hagan* v. *Prov. & Worcester Railroad*, 3 R. I. 188, Broughton, J., in delivering the opinion of the court says:

" In cases where punitive or exemplary damages have been assessed, it has been done upon evidence of such willfulness, recklessness, or wickedness on the part of the party at fault as amounted to criminality, which for the good of society and security to the individual ought to be punished. If, in such cases, or in any case of a civil nature, it is the policy of the law to visit upon the offender such exemplary damages as will operate as a punishment, and teach the lesson of caution to prevent repetition of such criminality, yet we do not see how such damages can be allowed, when a principal is prosecuted for the tortious act of a servant, unless there is proof in the case to implicate the principal, and make him *particeps criminis* of his agent's act. No man shall be punished for that of which he is not guilty. Cases may arise in which the principal is deeply implicated in the servant's guilt or fault,—cases in which the conduct of the principal is such as to amount to a ratification. In all such cases, the principal is *particeps criminis*, if not the principal offender ; and whatever damages might properly be visited upon him who commits the act, might be very properly inflicted upon him who thus criminally participates in it. But where the proof does not implicate the principal, and however wicked the servant may have been, the principal neither expressly nor impliedly authorizes or ratifies the act, and the criminality of it is as much against him as against any other member of society, we think it is quite enough that he shall be liable in compensatory damages for the injury sustained in consequence of the wrong of a person acting as his servant."

In *Railroad* v. *Finney*, 10 Wisconsin, 388, which was a case for putting a passenger off the cars before reaching the end of the route to which his ticket entitled him, the court below instructed the jury that " in this case, if you find the complaint sustained by evidence, you may give such damages as shall compensate the plain-

tiff for his loss by the act of the defendant, and also such exemplary damages as you may find proper under the circumstances." The defendants requested an instruction, " that they should give the plaintiff such damages only as would compensate him for his loss by reason of putting off the cars ; that they could not give vindictive or punitory damages, called smart-money." This instruction was refused. The court, in giving their opinion, say : " The judge improperly refused to instruct the jury as requested by defendants' counsel, that the plaintiff was only entitled to recover such sum as would compensate him for his actual loss by being put off the cars, and that he was not entitled to vindictive damages or smart-money. If it be admitted that the action of the conductor in expelling the plaintiff from the cars was willful and malicious, or so grossly negligent, oppressive, or insulting as to bring the case within the rule authorizing exemplary damages, if the suit had been brought against him ; yet there was not one word of testimony offered showing, or tending to show, that such conduct on his part was either previously directed, or subsequently ratified or adopted by the company ; although they may be liable in this action to indemnify the plaintiff for the actual loss or damage which he sustained by reason of the misconduct of the conductor, because it occasioned a breach of their duty or obligation to carry him from Madison to Edgerton. Still it does not follow that they may be visited with damages by way of punishment, without proof that they directed the act, or subsequently confirmed it. Defendants are not to be visited with damages by way of punishment, without proof that they directed the act to be done, or subsequently confirmed it. Such damages are given by way of punishing the malice or oppression, and are graduated by the intent of the party committing the wrong. But how can such damages be assessed against a principal with such intent ? Surely they cannot be. But in an action against the principal for the act of the agent, how can the question of their assessment be properly submitted to the jury when there is no evidence connecting the principal with such intent on the part of the agent ; clearly it cannot." The damages in this

case were $175, and the judgment of the court below was reversed.

*Turner* v. *The North Beach & Mission R. R. Co.*, 34 Cal. 594, was an action for unlawfully ejecting the plaintiff from a car by the conductor. The court below ruled, " that the injury, if committed, and if a willful one on the part of the defendants in their servant the conductor, and accompanied by malice or such acts as in their nature tended to show a purpose of resentment or ill-will, or a disposition to degrade the plaintiff, entitled her to what is called exemplary damages." After some comment, and citing Story's Agency, sec. 456; 19 Wend. 343; and 14 Howard, 486, before referred to, the court say, " Tested by these principles, it is obvious that in this case the defendant was not liable for any malicious and wanton conduct of the conductor. If liable at all, its liability must be confined to the actual damages which the plaintiff suffered. To render the defendant liable to punitive damages, it was incumbent on the plaintiff to show that the act complained of was done with the authority either express or implied of the defendant, or was subsequently adopted by the company." " If her expulsion resulted from the malice of the conductor, or was accompanied by violence or personal indignity, the conductor alone is responsible for such damages as she may be entitled to for this cause beyond the actual damages resulting from her exclusion from the car, unless as before stated the company expressly or tacitly participated in the malice and violent conduct of the conductor. In other words, if the act of the conductor was wholly unauthorized, the company is liable for the actual damage, and the conductor alone for the punitive damages, if any."

There is another case in the same volume, *Pleasants* v. *Same Defendants*, and decided upon the same grounds.

In *Clark* v. *Newson*, 1 Exch. 131; and 1 Welsby, Hurlstone & Gordon (a case of joint trespass by two), Pollock, Ch. Baron, said, " I think it would be very wrong to make the malignant motive of one party a ground of aggravation of damages against the other party who were altogether free from any improper motive.

In such case the plaintiff ought to select the party against whom he means to get aggravated damages."

In relation to the views thus expressed, it is said by Mr. Justice Walton, in his opinion, that, " In none of them was there any evidence that the servant acted wantonly or maliciously; they were simply cases of mistaken duty. And what these same courts would have done if a case of such gross and outrageous insult had been before them, as is now before us, it is impossible to say; and long experience has shown that nothing is more dangerous than to rely upon the abstract reasoning of courts, when the cases before them did not call for the application of the doctrines which their reasoning is intended to establish." Waiving, for the present, the question of fact as to whether they were or not simply cases of mistaken duty, we find in each of them the question of punitive damages legitimately and clearly raised and discussed, and the reasoning, such as it is, is before the profession. The cases are not cited as mere authority by reason of their being decided cases by courts of competent jurisdiction, but because the reasoning is believed to support the decision. If the reasoning is bad, fallacious, inconclusive, some would adopt the plan of exhibiting these facts by a course of reasoning of their own, rather than by promulgating a general proposition that it is unsafe to rely upon their reasoning. If the reasoning is sound and applicable to case at bar, it does not matter that it was, or was not necessarily called out in the case into which it has been introduced, and it requires some other answer than mere criticism upon course of proceeding by the judges in those cases.

That the gentlemen, composing the several courts alluded to, supposed the cases called for the decisions and reasonings they made, cannot well be doubted, and an examination of the cases as reported in the printed volumes of the reports referred to, will, I think, leave the reader in no doubt concerning that question.

There are some other cases to be found in the books not referred to on the defendant's brief to which I will advert as indicating the views of some of the courts in other States.

*Akerman* v. *Erie Railway Co.*, 32 N. J. 254, was an action to

recover damages for injuries sustained while traveling in their cars by reason of the carelessness and disobedience of the employees of the road. The court say: "It appeared on trial that the defendants had adopted all needful rules and regulations for the running of their trains, and had employed competent persons as tender of the switch at which the accident occurred. No care or caution, required for the safety of the passengers, had been omitted by the company. Through the carelessness and disobedience of their agents the accident happened." "In fact, the only fault or negligence complained of was that of the employees of the company: Where a railroad company adopts all rules and regulations needful for the safety of passengers, and employ competent agents, whose duty it is to see that these rules and regulations are observed, I do not think that the company, in case of injury to the passengers happening by reason of the failure of the agent to perform his duty, can be held liable for punitive damages. If, however, the company, as such, is in fault, a different rule applies. The company, for its own carelessness, may be justly held liable for smart-money. This rule does not prevail where the carelessness is only that of a subordinate agent. There is no justice in punishing the company after it has done all in its power to prevent an injury. The agent, if guilty of negligence, may, in certain cases, be proceeded against by indictment. I cannot yield to the argument so earnestly urged by the counsel of the plaintiff, that by construction of law the company is guilty of gross negligence whenever its agent is, and is, therefore, to be treated the same as if through its own negligence the injury happened. I think the verdict was against the charge of the court in that it is, to some extent at least, for punitive damages. Full compensation to the plaintiff for all real loss, present and prospective, was the measure of damages."

*Porter* v. *Same Defendants*, argued at the same time, was determined upon the rules announced in this case.

These cases well indicate the views of the court in New Jersey. *McKeon* v. *Citizens Railway Co.*, 42 Misso. 79, was an action for an injury done to a passenger. The court, in giving their opinion, say:

" If the conduct of this driver was willful and malicious with intent to injure the plaintiff, he might be liable to indictment for assault with intent to kill, or some other criminal offense ; but his employer was not responsible for his crimes, nor liable for his acts of willful and malicious trespass. The company was answerable only for his negligence, or his incapacity, or unskillfulness in the performance of the duties assigned to him. In such cases we have no hesitation in saying, that punitory damages, or any damages beyond a full compensation for the injury sustained, cannot be allowed."

*Louisville & Portland R. R. Co.* v. *Smith*, 2 Duval, 556 (Kentucky Reports), was a case where the evidence tended to show that the car of the plaintiffs was upset by the carelessness of their driver, and defendant injured thereby. The instruction was, " that if the car was thrown from the track by the fast and careless driving of the defendants' (now plaintiffs') agent, they should find for plaintiff (now defendant), and that the jury are not necessarily restricted to actual damages, but may, in their discretion, award such exemplary damages as they deem just and proper in view of all the facts in the case." The court say, the facts did not authorize a punishment of the defendants, and the court below should have restricted them to compensatory damages, and for this reason the judgment was reversed.

In the case of *Hill* v. *New Orleans Opelousas R. R. Co.*, 11 Louisiana, 292, the court used the following language : " In actions of this kind, it is not within the province of the jury, although negligence is clearly proven, to give vindictive damages, as is sometimes allowed in case of willful and malicious injuries. The company, in such cases, is not to be punished for the negligence of its agents as a crime."

*Keen* v. *Lezardie*, vol. 8, cases of the supreme court of Louisiana, page 26, was an action brought to recover damages of defendants, ship-owners, for injuries to plaintiff's wife, at the hands of a master of a vessel on which she was a passenger. The evidence showed gross neglect and wanton outrage on the part of the master against the lady. In delivering the opinion of the court, the judge

said, " It is true, juries sometimes give what is called smart-money. They are often warranted in giving vindictive damages as a punishment inflicted for outrageous conduct. But this is only justifiable in an action against the wrong-doer, and not against persons who, on account of their relation to the offender, are only consequentially liable for his acts, as the principal is liable for the acts of his factor or agent."

In *Jefferson R. R. Co.* v. *Rogers*, 28 Indiana, 1, it is said: " Whatever rule of damages would apply in a suit against a natural person, ought to apply in a suit against a corporation. Any discrimination in that regard would shock the public sense of impartial justice, and would be an unjust innovation. The instructions, governing subordinate employees and agents, may be devised in such utter disregard of the rights of others, that obedience to them will result in palpable wrong to individuals; whether it was so here was a question for the jury," thus putting the question whether the acts are done in obedience to instructions that the execution of would result in palpable wrong.

*Detroit Daily Post Company* v. *McArthur*, 16 Mich. 447, was an action by McArthur for publishing an alleged libel. The court say: " The employment of competent editors, the supervision, by proper persons, of all that is to be inserted, and the establishment and habitual enforcement of such rules as would probably exclude improper items, would reduce the blame-worthiness of a publisher to a minimum for any libel inserted without his privity or approval, and should confine his liability to such damages as include no redress for wounded feeling, beyond what is inevitable from the nature of the libel. And no amount of express malice in his employees should aggravate damages against him, when he has thus purged himself from blame." " While, therefore, in the present case the reporters were guilty of carelessness in receiving hearsay talk of legal charges, which could only be lawfully published in accordance with the documentary facts, and while there could be no justification for publishing outside scandal against an individual from any source whatever, yet the defendants were only responsible

beyond the damages recoverable under any circumstances, for such a libel to the extent of their own conduct in the case, or want of care used in guarding their columns against the insertion of such articles."

In the case of *R. R. Co.* v. *Baum*, before cited, the court say: " But when the act is unnecessary to the performance of the master's service, and not really intended for that purpose, but is done by the servant to gratify his own malice, though, under pretense of executing his employment, it is not done to serve the master, and is not, in fact, within the scope of the employment, and the master is not, therefore, liable." " Under these circumstances, last enumerated, it is not easy to perceive, in the nature of things, any just reason for holding the master responsible. It will not do to say he shall answer in damages, because by employing the servant he gives him opportunity to maltreat those with whom he comes in contact in discharging his duties, that reason would hold the shop-keeper for any outrage committed by his clerk upon a customer; the merchant for the like conduct of his journeyman; and, indeed, it would be equally applicable to almost every department of business in the conduct of which it is necessary or convenient to employ assistants to deal with the public. Even the inn-keeper, whose cook feloniously mingles poison with the food of a guest, must then respond in damages."

In *Kleen* v. *Central Pacific R. R. Co.*, 37 Cal. 400, the court say: " As to the general rule upon that subject there can be no doubt. If the act of the conductor, in pulling the plaintiff off the cars was a wanton and malicious act, committed out of the course of his agency, the defendant cannot be held responsible for the manner in which he did it, unless, however, the defendant expressly authorized the act."

In the case of the " Amiable Nancy," 3 Wheaton, which was a suit for a marine trespass, Mr. Justice Story, in delivering the opinion of the court, among other things says: " Upon the facts disclosed in the evidence, this must be pronounced a case of gross and wanton outrage without any just provocation or excuse; under

such circumstances, the honor of the country and the duty of the court equally require that a just compensation should be made to the unoffending neutrals for all the injuries and losses actually sustained by them. And if this were a suit against the original wrong-doers, it might be proper to go yet further and visit upon them, in the shape of exemplary damages, the proper punishment which belongs to such lawless misconduct. But it is to be considered that this is a suit against the owners of the privateer upon whom the law has, from motives of policy, devolved a responsibility for the conduct of the officers and crew employed by them, and yet from the nature of the service they can scarcely ever be able to secure to themselves an adequate indemnity in cases of loss. They are innocent of the demerit of this transaction, having neither directed it, nor countenanced, nor participated in it in the slightest degree. Under such circumstances, we are of opinion that they are bound to repair all real injuries and personal wrongs sustained by the libellants, but they are not bound to the extent of vindictive damages.

In *Wardrobe* v. *California Stage Co.*, 7 Cal. 118, the jury found for actual and exemplary damages in the sum of $2,500. The chief justice, in delivering the opinion of the court, quoted with approval the opinion of Judge Story in the " Amiable Nancy," and said, " when it appears that the coach at the time of the accident was driven by a servant or agent of the owner, the rule in such case is, that the principal is liable only for simple negligence, and that exemplary damages cannot be enforced against him."

In the case of *Moody* v. *McDonald*, 4 Cal. 297, the facts were similar to the above, and in the action brought against the principal for tortious acts of his servant, where the jury gave $2,500 damages, and $2,500 smart-money, the court disallowed the verdict for the smart-money, holding the principal liable only for compensatory damages.

In *McLellan* v. *Cumberland Bank*, 24 Maine, 566, the court say : " The first question obviously presented by the case is, can a corporation aggregate be chargeable with malice ? Such corporations have

been held answerable in trover; and might, perhaps, in other actions sounding in tort for all acts done by their officers under circumstances implying authority to do them. But it may well be doubted if such corporations can be implicated by the acts of their servants in transactions in which malice would be necessary to be found in order to the sustaining an action against them therefor."

Two cases are cited by Mr. Justice Walton as sustaining the rulings of the presiding judge; one in New Hampshire, and one in Mississippi.

In the case in New Hampshire (*Hopkins* v. *The Atlantic & St. Lawrence R. R. Co.*, 36 N. H. 1) the ruling complained of was " that if the jury should find the defendants guilty of gross negligence at the time of the collision, and the plaintiff's injury was occasioned by such negligence, they might in their discretion give exemplary damages."

" To this instruction two objections are made:

1. That it is not a case for exemplary damages, because the negligence, which is the foundation of the suit, was the negligence of the defendant's servants;

2. Because the facts of the case disclose no fraud, malice, violence, cruelty, or the like, nor any turpitude or moral wrong."

Upon the last point, the court hold that " gross carelessness in such case implies a heedless disregard for human life, and for the safety of passengers who intrust themselves to the care of the road, which brings the case very strongly within the rule that the wrong complained of, to warrant exemplary damages, must have something of a criminal character."

In relation to the first objection the court say: " The defendants are a corporation, and can act in no way but by their officers, agents, and servants; and when their officers, agents, or servants act within the scope of their authority and employment, it is the act of the corporation, and their negligence is the negligence of the corporation;" and they cite Angell & Ames on Corp. 386, and *Chestnut Hill Turnpike* v. *Rutter*, 4 S. & R. 6.

It will be noticed that the learned chief justice, who drew this

opinion, makes only such acts of the agent, as are authorized by the corporation, their acts.   It is such as are within the scope of their authority as well as employment.   He does not say that unauthorized acts by the agent become the acts of the principal.   His proposition conforms to the rules which we have before deduced from the authorities.   A recurrence to the authorities, cited by him, will show this.   Section 386, Angell & Ames on Corp., which is cited, reads as follows: " Yet it is somewhat remarkable that the question whether an action of trespass would be against a corporation should not, until within a very late period, have been the subject of express judicial decision.   In the case of *Maud* v. *Monmouthshire Canal Company* it was expressly decided by the English court of common pleas, in 1842, that trespass will lie against a corporation.   The action was brought for breaking and entering locks on a canal, and seizing and carrying away barges and coal.   The trespasses, it was proved, had been committed by an agent of the company, which was incorporated by an act of parliament, and the barges and coal, it appeared, had been seized for tolls claimed to be due them.   The only question being whether trespass would lie against a corporation aggregate for an act done by their agent within the scope of their authority.   The court held, that when it is established that trover will lie against a corporation, there could be no reason why trespass should not also lie against them ; that it was impossible to see any distinction between the two actions."

This section which is cited relates alone to the question whether or not trespass can be maintained when the act done was within the scope of their authority ; that is the authority conferred by the corporation, and it is held, when the act is done by the authority of the corporation, it is the act of the corporation, and trespass will lie.

The next section, save one, which follows (388) says: " It is of importance, however, to be observed, that an action of trespass cannot be sustained against a private corporation for an act done by one of its agents unless done *communicato consilio*, or, in other words, unless the act has been directed, suffered, or ratified by the corporation.   A corporation is liable for an injury done by one of its ser-

vants in the same manner and to the same extent only as a natural individual would be liable under like circumstances. The well-known rule of law is, that if the cause of an injury to a person be immediate, though it happens accidentally, the author of it is answerable in trespass as well as in case; but a master, whether a natural individual or an artificial one, is not liable for a willful act of trespass of his servant."

With these authorities before him we cannot well suppose he meant to include any unauthorized act of the agent. He was too good a lawyer to say that an act done against the master's orders and directions was the act of the master. Did these, however, leave us in doubt, what follows upon the same page of his opinion would seem to put the matter at rest, for he proceeds to say: "Corporations may be sued in trespass for the authorized acts of their servants; and if the trespass is committed by their authority, with circumstances of violence and outrage such as would authorize exemplary damages against an individual defendant, it is not easy to discover any ground for a different rule of damages against the corporation which the law charges with the consequences of the act as the responsible party. If a corporation like this is guilty of an act or default such as, in case of an individual, would subject him to exemplary damages, we think the same rule must be applied to the corporation."

This we understand to be in harmony with all the authorities, and comes within the first class of cases to which I have referred. The act is theirs, because done by their authority. Being theirs, they are held as would be an individual defendant. If unauthorized, it is not their act, although they may, upon other principles, be liable to compensate for the injury done.

The ground upon which exemplary damages is allowed is, that the trespass is committed by their 'authority "with such circumstances of violence and outrage as would authorize exemplary damages against an individual defendant. I regard the law, as stated by the chief justice, as directly sustaining the views that I present, viz.: that to be chargeable with the *animus* of the transaction, it

must be theirs by previous authority, direct or implied, or subsequently adopted or ratified by them. The instruction in the court below required the defendants to be guilty of gross negligence to subject them to exemplary damages; and the sum total of the decision was that this was right, and that if the act was done by the authority of the defendants, it was the act of the principal. What evidence there was, if any, that the defendants participated in the act which produced the injury, does not appear; nor does it appear that the jury found the defendants were guilty of gross carelessness. All the remarks of the chief justice are made upon the hypothetical case of an injury happening through the gross carelessness of the defendant corporation.

The case in Mississippi came before the court on a motion to set aside the verdict. The discussion in the opinion is upon the propriety and authority of the court to set aside verdicts on account of the amount of damages in those cases where there is no fixed rule of computation, and the authorities cited are almost all of them upon this point. There was no ruling excepted to, and no question of law presented. Upon the matter of punitive damages, referred to by Judge Walton in his opinion, they say: " The case is much stronger for the defendant in error, than were the facts in the case of *Heirn* v. *Mc Caughan and Wife*, 32 Miss. 18. The decision in that case was conclusive in this, as to the form of action as well as the right of the jury, in such cases, to protect the public, by punitive damages, against the negligence, folly, or wickedness which might otherwise convert these great public blessings into the most dangerous nuisances."

It will be perceived that this case, so far as any consideration of punitive damages was concerned, was regarded as settled by the case in the 32d Mississippi.

Looking at that case I find it was an action brought for an act done by a partner. Heirn with others were owners of a vessel. Grant, one of the owners, was the captain. The court say, by Hand, J., " There was testimony tending to show that the captain in charge of the boat, which was published to stop at Pascagoula at

the time specified, willfully and capriciously disregarded the obligation incurred by the publication, and that the failure occasioned great bodily exposure, and mental suffering and disappointment to the plaintiff (now defendants) ; these circumstances were properly submitted to the jury, to be considered by them, with the circumstances of excuse or extenuation relied upon by the defendants; and it was their province to determine whether there was such fraud or willful neglect of duty causing oppression to the plaintiffs, and under such circumstances of aggravation as to warrant exemplary damages. This was the substance of the rulings of the court upon this point, and we perceive no error in them."

This is the case which decided all that was said in the 36th Miss. about punitive damages, and was an action brought against several partners for the act of one of them. The value of this case, in support of the principle that a railroad corporation may be punished for the malice of an employee, cannot, I think, be considered great, especially when, in the case in the 36th, we find this remark : " It is not enough that, in the opinion of the court, the damages are too high. It may not, rightfully, substitute its own sense of what would be a reasonable compensation for the injury, for that of the jury." Since the opinion in this case was drawn, and since writing this opinion, my attention has been directed by Mr. Justice Walton to the case of the *Baltimore & Ohio Railroad Company* v. *Blocher*, 27 Md. 277, as a case sustaining the ruling of the court in the case at bar.

Upon an examination of that case, it will be found that a difficulty arose between the conductor of train upon the appellant's road and appellee about his ticket; the one contending it had been surrendered to the conductor, and the other averring it had not, and to prevent being put off the train, the appellee paid his fare ; it subsequently appeared that he was right, and properly surrendered his ticket when called upon so to do. He alleged that the conduct of the conductor was violent and insulting.

At the trial of the case, the appellants requested the court to instruct the jury as follows:

" 7. If the jury believe the conductor caught the appellee violently, etc., by the collar and dragged him from his seat, while a passenger in the train, the appellee is not entitled to recover for the same in this action against the appellants, unless they believe the appellants authorized the act, and adopted and justified it since its committal."

" 8. That if the jury believe the conductor wrongfully extorted · from the appellee the fare from Martinsburg to Baltimore, after the appellee had surrendered his ticket, etc., the appellee was not entitled to recover vindictive or punitive damages from the appellants, unless they expressly or impliedly participated in the tortious act authorizing it before, or approving it after, it was committed." ·

Concerning these two requests, the court say : " The conductors and employees of the corporation represent them in the discharge of these functions, and being in the line of their duty in collecting the fare or taking up tickets, the corporation is liable for any abuse of their authority, whether of omission or commission. *Vide* Redfield on Railways, 381, note 6, and authorities there cited. The court was, therefore, right in rejecting so much of the defendant's prayers, as limited their liability to such tortious acts of their agents as they had either personally authorized or subsequently approved."

The seventh and eighth prayers, requiring the plaintiff to prove either previous authority or subsequent approval of the acts of the conductor to render the defendant liable, were rejected for reasons before assigned " [those above copied]. " The prayer of the appellee claims compensation for injury to his feelings and degradation of character. The appellant's eighth prayer affirms he is not entitled to recover vindictive or punitory damages against the company, unless they expressly or impliedly participated in the tort, by authorizing it before, or approving it after. We have already declared our opinion on the latter branch of this proposition. This court, in the case of *Gaither* v. *Blowers*, 11 Md. Rep. 552, said, that where the injury was accompanied with force or malice, the injured party might recover exemplary damages. The action

being *vi et armis*, or in that character, the jury were authorized to give whatever damages the evidence showed the immediate consequence of the wrong warranted, and which necessarily resulted from the act complained of. 2 Greenl. Ev. sec. 89. *McNamara* v. *King*, 2 Gilman, 436. 2 Greenl. Ev. 254. *McTavish* v. *Carroll*, 13 Md. 439."

This is all that is said upon this question. I have quoted the requested instructions, and the remarks of the court upon them. The conclusion of the court, and the law of that case, is found in these words: " The action being *vi et armis*, or in that character, the jury were authorized to give whatever damages the evidence showed the immediate consequences of the wrong warranted, and which necessarily resulted from the act complained of."

A careful examination of that case will disclose the fact that the question of damage raised and decided, was whether the plaintiff had a right in such case to recover " for injury to his feelings, and degradation of character." This was the prayer of the appellee, and he asked no more, and no other instruction was given. These were treated as exemplary damages by the appellants, and they sought, by their request, to limit the damages to the actual physical and pecuniary injuries. An examination of the authorities cited by the court in their opinion will lead to the conclusion that they regarded that as the question, and considered such damages exemplary damages. They cite Mr. Greenleaf for the rule they lay down, and I hazard the opinion that Mr. Greenleaf never expected to be quoted as an authority for punitive damages in civil actions. (See his note to sec. 253, vol. 2 on Ev.) The case of *Gaither* v. *Blowers* referred to, goes no further than Mr. Greenleaf and his language, *totidem verbis*, is used as the authority for the doctrine advanced.

Mr. Greenleaf, in the note referred to, speaking of the term " exemplary damages," as used by the courts in a case he is reviewing, says: " From this and other expressions it may well be inferred, that by actual damages the court meant those which were susceptible of computation, and that by exemplary damages or

smart-money they intended those damages which were given to the plaintiff for the circumstances of aggravation attending the injury he had received, and going to enhance its amount, but which were left to the discretion of the jury, not being susceptible of any other rule."

The rulings, in the case at bar, covered all these intangible matters before reaching the point of punishing the defendant corporation. They had been told " to consider the injury to his feelings, his wounded pride, his wounded self-respect, his mental pain and suffering occasioned by the assault, and the feeling of degradation that necessarily resulted from it." This was going as far as the court in Maryland went or was asked to go, and does not reach the ground of complaint in the case at bar. I find no evidence in it of a design to go beyond this; the rule was declared in plain terms to be such damages as " the evidence showed the immediate consequence of the wrong warranted, and which necessarily resulted from the act complained of." This certainly does not include damages by way of punishing the defendants. Such damages would not be the immediate consequence of the wrong, and necessarily resulting from it.

Some comment is made concerning the retention of Jackson in the defendant's employ. All that I find, in the report of the case concerning the matter, is a statement, made by the plaintiff in his testimony, that he had seen him several times since, in performance of duties upon the train.

So far as any question arises upon the rule of damages laid down in the instruction, it is quite apparent this is perfectly immaterial, and could be regarded, in any event, only as remote evidence of ratification. If he was retained in their employ, we do not know under what circumstances; possibly they were such as would have furnished to the mind of any reasonable man a perfect justification; sitting here, we must take the report as we find it. The opinion states that the jury undoubtedly regarded it as " a practical ratification and approval of his conduct." Could they have done so if they had been correctly instructed in the theory now advanced?

Goddard *v.* Grand Trunk Railway.

What was there to ratify? Yea, more, who was there to ratify? If the servant is the corporation, and the act of commission was the act of the corporation, was there anything to ratify? Was it not an original act of the corporation? Did they ratify their own act? If the act of commission was originally theirs, the act of retention was a subsequent act, having no relation to the first. Did that infringe any right of his? If it did, it was a new and substantive cause of complaint not embraced in this declaration. If, however, the theory which is now advanced is not only novel but unsound, and that previous command or subsequent approval was necessary to warrant the infliction of punishment, the matter was of vital importance, and the defendants should have had the advantage of the instruction. It is not quite right, I think, to now assume that the jury regarded it as a ratification. Possibly the gentlemen composing that jury were not quite prepared to find that the gentlemen composing the administrative and executive departments of that corporation were so lost to all that is decent and honorable among men, and so blind to their own interests that they would justify an act condemned by everybody. Giving full force to the encomiums bestowed in the opinion upon juries, might we not conclude that they would be more likely to infer, from the circumstances, that such amends had been made as honorable gentlemen would require, rather than convict them of an act that any prison convict would cry out against?

Will it do to shield the verdict with that which the jury were substantially told was immaterial?

I have not considered this case upon the motion, or upon any facts supposed to be proved by the evidence reported, nor have I considered the question whether, under the plaintiff's declaration, he can recover upon the grounds set forth in the opinion. I have only considered the rule advanced by the instructions. Under this rule a railroad corporation may exercise all possible care in the selection of servants, and strictly enjoin them from day to day against any irregularity of conduct; yet if one of them, unmindful of his duty, regardless of his master's interest, and bent on exercising some pri-

vate malice against a person who happened to be a traveler, assaults him, the corporation must not only make full compensation for all the injury, under the most liberal rules, but may be punished for an act they have used every endeavor within the reach of human power to prevent. One committed by another, against their wishes, interest, and positive commands; and it is to be such a punishment as will " serve as a warning and example to others."

If we were punishing the actor himself, we should consider the probable effect of a given punishment upon him; but when, for his offense, we punish another, how can we form any idea of the influence of a punishment he cannot feel. The master may discharge him from his employment, and he thus feel the punishment another suffers indirectly, and to that extent. It will be perceived, however, that this is the extent for all classes, kinds, and degrees of offense. It is the only channel through which he can be made to feel it. But suppose it were otherwise, is the punishment which is inflicted upon the innocent party any the less keen, unjust, and onerous?

Is that in any degree affected by the manner in which the offender receives the intelligence of its infliction upon another? Again; how shall the corporation avoid the constant recurrence of penalties for the offenses of others? Can they, when they select another servant, exercise any more care or be more watchful over him? Can they change the passsions of men? What is their fault if they have exercised all the care, wisdom, and prudence with which men are invested? Must they be punished for not being omnipotent?

If the idea and design of punishment is to restrain the offender and make the punishment serve as a warning to others, how can it better be done than by making it personal; inflicting it upon the offender? How can its influence upon others be made more restraining than by the reflection that they must personally suffer the same punishment if they offend? Is the reflection that others will suffer it, more potent with that class of individuals? Has the observation of men led to this conclusion? And if it has, have all the principles of reason, right, and justice yielded to it and made it right?

If the punishment, thus inflicted, is to serve as a warning to others, who must take warning? Evidently the innocent as well as guilty. The innocent are to be the greatest sufferers by reason of the offense, and punished alone directly. It is to serve as a warning to all innocent persons, that they may be punished for the offenses of others, after having fully compensated the injury done.

One other consideration I barely suggest. The liability in this case is based upon a contract; purely so. No liability could, under the proof, arise by the rules of law applicable to master and servant. Had the plaintiff been a stranger to the defendants, and had no claims upon them, except such as each citizen owes to the other, no liability of any kind would have attached to these defendants for the willful trespass of their servant. Not only would they be saved punishment, but compensation even. Now it being a case where no liability would attach, but for the contract, and the liability which does attach being for breach of contract, the rule in this case is not only punishing one for the act of another, but it is doing this in an action *ex contractu*, for this declaration must be construed to be such to meet the law of the opinion.

All consideration of the matter tends to show the fundamental error in holding an innocent party liable to punishment. In all these acts, done by the command of the principal (whether the authority appears by direct command or by fair implication from the proceedings of the party charged), there is propriety in punishing if the act be wrong and an infraction of the moral code; but in those cases where the act is unauthorized, and the principal is in nowise connected with the *animus* of the actor, and becomes liable to compensate upon grounds other than that the act was done by his command, it appears to me that all punishment inflicted, or rather all suffering imposed under the name of punishment, is flagrant injustice; it is not punishment, for it has not its necessary antecedent, wrong: both reason and authority are opposed to it, and no case can be found, where the question has been presented and discussed, in which such doctrines are not denounced as unsound and unjust. In addition to the cases which I have cited, there is the pregnant

fact-that no case can be found in Massachusetts or New York where it has ever had any sanction, even in the inferior courts; and no case can be found, that I am aware of, where any party has sought to establish any such rule by an appeal to the superior courts or courts of last resort in those States. Yet these States are a net-work of railroads, and questions of liability are constantly arising and being settled by the courts of those States. It appears to me the fact has some significance.

The rule established in this case is so important, and fraught with such results under the ordinary modes of administering law, that I have felt impelled to enter my dissent at length, and regret that the pressure of other duties have prevented me from giving a more extended examination of the authorities, and the compression of them and my own views into a narrower compass.