**COLLAZO**

v.

**JOHN W. CAMPBELL FARMS, Inc.**

**No. 14733.**

United States Court of Appeals, Fifth Circuit.

May 31, 1954.

Rehearing Denied July 7, 1954.

Oliver W. Folmar, Tavernier, Fla., Randolph Calhoun, Sarasota, Fla., for appellant.

B. E. Hendricks, Miami, Fla., Hendricks & Hendricks, Miami, Fla., for appellee.

Before STRUM and RIVES, Circuit Judges, and DAWKINS, District Judge.

DAWKINS, District Judge.

This is an appeal from a directed verdict for the defendant.

Appellant, a citizen of Puerto Rico, charged that defendant corporation, through its employees, or agents, acting within the scope of their employment had him falsely arrested and violently beaten without provocation, willfully and maliciously, thereby causing him great humiliation, loss of time in his employment, pain and anguish, for which he demanded the sum of $75,000 as damages.

Respondent's answer was a general denial, and, in the same pleading, it moved to dismiss the complaint on the grounds (1) that it failed to state a cause for which relief might be granted, (2) that "it affirmatively appears * * * the matter in controversy * * * does not exceed the sum of $3,000.00, the minimum jurisdiction of a federal court," (3) the allegation that the individuals involved were servants of defendant was a conclusion of law and failed to give their names, and (4) that it further affirmatively appeared that "if the alleged act occurred * * * it would not be per se an act within the scope" of their employment.

█ The verdict for defendant was based upon a finding that there "was no evidence from which it might be inferred * * * that William E. Campbell" acted "within the line and scope of his authority, express or implied, in behalf of the defendant corporation." To justify the directing of a verdict, every inference favorable to the party against which it is given must be accorded, and if reasonable men might differ as to whether any relief could be granted, then it should be denied. Marsh v. Illinois Central R. Co., 5 Cir., 1949, 175 F.2d 498; Banks v. Associated Indemnity Corp., 5 Cir., 1947, 161 F.2d 305; Lowrie v. American Surety Co., 5 Cir., 1945, 146 F.2d 33; Dawson v. McWilliams, 5 Cir., 1945, 146 F.2d 38; Goodall Co. v. Sartin, 6 Cir., 1944, 141 F.2d 427.

Appellant, a native Puerto Rican, along with several hundred others, was employed during the 1949–50 season as an agricultural laborer on the tomato farms operated by appellee corporation (defendant below) near Princeton, Florida. He was so employed under the name of "Juan Roberto Torres" during the period October 27, 1949, to February 15, 1950, according to the defendant's records.

John W. Campbell was the principal stockholder, president and general manager of defendant corporation, which was organized January 10, 1950, and began formal operations as a corporation about March 1, 1950. Previously, the farms were operated by a partnership composed of John W. Campbell and two other individuals.

On the property of the corporation were located the housing facilities for the Puerto Rican laborers, referred to by the participants in this matter as the "quarters" or "camp". There was also, among other buildings, a large garage or workshop wherein the mobile equipment used on the farms was stored and repaired.

According to John Campbell, the operation of the farms was under his direct and personal supervision; and he was there "during the season" from early morning until late evening. He testified that the work was departmentalized, and that there were five supervisors in March, 1950; that each supervisor had several crews under his control; and that each crew consisted of twenty-five to thirty-six men under the direct charge of a crew or field foreman. One of the supervisors at the time involved was William E. Campbell, the nephew of John Campbell. William was also a director and a minority stockholder of the defendant corporation, and lived on the farm.

John Campbell further testified that the corporation employed a "camp manager" to check equipment and conditions

in the camp and "to report any trouble in the camp, to keep everything straight".

At the time involved herein, the camp manager was one Rafael Carrara. The president further testified all employees were instructed in the event of "trouble" at the camp, the same should be reported to William Campbell, or the supervisor within whose jurisdiction it occurred, who, in turn, was required to summon the state police or county patrolmen. President Campbell denied he had ever authorized or intended that any employee should use force to quell any disturbance. He admitted, however, that William Campbell carried a "card" signifying that he was a special deputy sheriff of Dade County, but denied that either he personally or the corporation had anything to do with William's acquisition of the card or the office it signified.

Rafael Carrara, the camp manager, but no longer employed at the time of the trial, testified that his job was to keep order in the camp. He stated that John Campbell was known as the "big boss" but that William was his "right hand man" and was "boss" of the farm; and that he (Carrara) took orders only from William. He partially corroborated John Campbell's testimony in that he said his orders from William were to keep order in the camp and to call the office if affairs got out of his control. He further stated that in his capacity as "boss", William carried a deputy sheriff's badge, guns and a whip "all the time", and that he had seen John Campbell more than once in William's presence when William was armed with these weapons. (John Campbell consistently denied ever knowing that William had guns or any other weapons at the farm.)

Appellant testified that on the night of March 15, 1950, he had gone to the Campbell farm to get his mail (his employment with the corporation having been terminated approximately one month earlier), but was told to leave by one Tito Felisiano, "friend of William Campbell". He then returned to Homestead, Florida, and shortly thereafter took a taxi to go to Roote's camp, where he was then living. This was about 10:35 P.M. He stated that when the taxi was about two blocks from Roote's camp, it was stopped by William Campbell, two Puerto Ricans and two policemen; that William pulled him out of the taxi under the pretense of arresting him, handcuffed him, took his wallet containing $180, put him in his (William's) car and drove to the Campbell farm, with the policemen following. He testified that when they reached the garage on the Campbell farm, William spoke to the policemen and they left. Then, he said, William locked him in the garage, handcuffed him to a tractor, beat him with a large blackjack or whip for about an hour and otherwise abused him physically. Appellant also testified that during the period of his employment, he and the other laborers knew William as the "boss" of the farm from whom all employees took orders.

Sam Accursio, the driver of the taxi in which appellant was riding, related the incident of appellant's "arrest" somewhat differently. He stated that when the taxi was stopped, he saw two policemen, one Puerto Rican and William Campbell; that one of the policemen had remarked that appellant had "shot up" Campbell's farm; that the police took appellant out of the taxi, took a gun from him and allowed him to re-enter the taxi; that he (the driver) thereupon transported appellant to Roote's camp and left him, without even collecting the fare.

Juan Molina Alvarez testified that although he was not employed there, he was on the Campbell farm frequently at about the time of and prior to the alleged beating. He represented himself as being a benefactor of the Puerto Ricans employed there. He stated that William Campbell carried guns, a whip, handcuffs and a blackjack and that he had seen John Campbell and William together at the farm on occasions when William was so armed. He further stated that he had seen appellant the day following the alleged beating and described his condition.

In Florida, whose law applies, a master is liable for the torts of his servant or agent committed in the scope or range of his employment or in the pursuit of his employer's business, Western Union Telegraph Co. v. Michel, 120 Fla. 511, 163 So. 86; Reece v. Ebersbach, 152 Fla. 763, 9 So.2d 805; Saucer v. Willys-Overland, Inc., D.C., 49 F.2d 385; Hooper-Holmes Bureau v. Bunn, 5 Cir., 161 F.2d 102. This liability also extends to acts committed by an employee or agent who has deviated slightly from his employer's business or instructions, Western Union Telegraph Co. v. Michel, supra; and even to willful acts or crimes committed by an employee when they are done within the scope of employment or in the interest of the business of the employer. But the master is not liable for an act of the employee when the employee exceeds the authority expressly granted him or that implied from his duties. Stinson v. Prevatt, 84 Fla. 416, 94 So. 656; Winn & Lovett Grocery Co. v. Archer, 126 Fla. 308, 171 So. 214.

Nor does liability attach when the act is committed solely for the employee's own purposes. Stinson v. Prevatt, supra; Western Union Telegraph Co. v. Michel, supra; but if done within the scope of the employment, and in part to serve the purpose of the servant, the master is liable, Hooper-Holmes Bureau v. Bunn, 5 Cir., 161 F.2d 102.

The Supreme Court of Florida rather emphatically held in the case of Winn & Lovett Grocery Co. v. Archer, supra [126 Fla. 308, 171 So. 220], that a corporate employer stands in exactly the same position under the law as does an individual, both as to liability and as to the damages allowable. In that case the Florida court quoted with approval, the following from Goddard v. Grand Trunk Ry., 57 Me. 202, 2 Am.Rep. 39 (which is also cited in 2 Sutherland on Damages, 4th Ed., p. 1341, et seq.) :

"'A corporation is an imaginary being. It has no mind but the mind of its servants; it has no voice but the voice of its servants; and it has no hands with which to act but the hands of its servants. All its schemes of mischief, as well as its schemes of public enterprise, are conceived by human minds and executed by human hands; and these minds and hands are its servants' minds and hands. All attempts, therefore, to distinguish between the guilt of the servant and the guilt of the corporation; or the malice of the servant and the malice of the corporation; or the punishment of the servant and the punishment of the corporation, is sheer nonsense; and only tends to confuse the mind and confound the judgment. * * *'"

We cannot agree that there was *"no evidence"* from which a jury might fairly conclude that William Campbell was acting within the scope of implied authority consonant with his employment by defendant corporation. While it is somewhat indirect and perhaps weak from the standpoint of credibility, we think there is considerable evidence in the record from which the jury might have concluded that William Campbell was employed as "resident" manager for the corporation of which he was a stockholder and director; that as such, he was impliedly charged with the responsibility of maintaining a strict degree of discipline over the Puerto Rican laborers; that his duties included the protection of the corporation property and the prevention of outside interference with the labor force; that in pursuance of these duties, he armed himself with devices which could only be used to inflict bodily injury upon those against whom they were employed, and that he did so with the knowledge and acquiescence of the president and general manager; and further that the jury could have found he arrested and beat appellant on the property of defendant corporation in order to carry out the duties expected of him, even though the act was extreme, unlawful and partially to gratify a personal desire to punish appellant. In Stinson v. Prevatt, previously cited [84 Fla. 416, 94 So. 659], the facts were similar to those in the present case.

There it appeared that a corporation's employee was alleged to be "quarters boss" of a sawmill labor camp occupied by Negroes. Witnesses testified that " 'it was generally known that Stinson was armed when about his business as quarter boss.' " Prevatt, not employed by the defendant corporation, was present at the camp, and a crowd gathered. Stinson appeared, allegedly suspecting Prevatt of attempting to entice workers away from the camp, and sought to "arrest" Prevatt. The opinion does not reflect his reasons, but Stinson then shot and killed Prevatt. The Court held:

> "*It was for the jury to determine from the evidence* whether Stinson shot plaintiff's decedent maliciously in pursuit of his own purpose or whether Stinson committed the wrongful act while acting in his capacity as agent of the defendant corporation to serve the interests of his employer, though the act was not authorized by his employer. *In the first case the defendant company would not be liable, but in the latter case it would be.* (Emphasis supplied by writer.)

> \* \* \* \* \* \*

> "There is evidence to sustain a finding that the wrongful act of Stinson was committed while 'acting in his capacity of agent of the corporation,' though the particular act was not authorized; and, as it does not *clearly* appear that the act was maliciously done for Stinson's own purposes, *the evidence is legally sufficient to sustain a general verdict of liability of the defendant company* \* \* \*." (Emphasis supplied by writer.)

■ Under the authorities cited, we are constrained to hold that there was sufficient evidence in the record at the close of appellant's case to require submission to the jury and, accordingly, the judgment appealed from is reversed, and the cause is remanded for further proceedings not inconsistent with the views expressed herein.

RIVES, Circuit Judge.

I concur specially.

RIVES, Circuit Judge (specially concurring).

■ While I concur in what has been so ably written by Judge DAWKINS, I would add a few further observations.

■ John W. Campbell, the appellee's alter ego, called by the plaintiff as an adverse witness, admitted that William Campbell was instructed to maintain order. The jury could reasonably find from the evidence that for such purpose William Campbell habitually carried guns, a black-jack, a horse whip or bull whip visible to all, including John W. Campbell, and that on occasions he made use of the whip. The complaint, however, is not based on the theory of liability recognized in Florida that the master knowingly kept a dangerous employee on the premises. Mallory v. O'Neil, 69 So. 2d 313.

Appellant testified in part:

"A. I asked him why was he arresting me since he was not a cop, a policeman.

"Q. What did he say? A. He says, 'I have orders to do this.' Then he took out a gun from his pocket and showed it to me.

"Q. He said he had orders to arrest you? A. Yes, sir.

"Q. Did he say who gave him the orders? A. He did not tell me."

So far as the evidence shows, the appellee was William Campbell's sole employer. The fact that the appellant was returned to appellee's premises where the flogging was administered is some evidence tending to establish appellee's liability, 35 Am.Jur., Master & Servant, § 575. Appellee was not called upon to introduce any evidence. While it may have been able to show that William Campbell, at the time of the beating, was not doing anything in furtherance of its business, it seems to me that the tes-

timony at present permits inferences that, in returning appellant to the corporate premises and beating him with a bull whip while handcuffed to the tractor, William Campbell was acting in what he thought was the appellee's interest by making an example of appellant for returning to the camp without permission, for "shooting up" appellee's property, or for some other claimed misconduct against appellee's interest, and so as to keep the other Puerto Ricans in line, and to put them on notice that he would not brook any insubordination.

STRUM, Circuit Judge, concurs.